**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

**WORLD EXPRESS & CONNECTION, INC.,**

**Plaintiff,**

v.

**CROCUS INVESTMENTS, LLC, CROCUS FZE, ALEXANDER SAFONOV, AND MIDDLE EAST ASIA ALFA FZE,**

**Defendants.**

---

**CROCUS INVESTMENTS, LLC, CROCUS FZE, ALEXANDER SAFONOV, and MIDDLEEAST ASIA ALFA FZE,**

**Third-Party Plaintiffs,**

v.

**MARINE TRANSPORT LOGISTIC INC., ROYAL FINANCE GROUP, INC., CAR EXPRESS & IMPORT INC., ALEKSANDR SOLOVYEV, VADIM ALPER a/k/a DIMITRY ALPER, ALLA SOLOVYEVA, RAYA BAKHIREV, and ROMAN CHERNIN,**

**Third-Party Defendants**

Civ. No. 15-8126 (KM) (MAH)

**OPINION**

---

**KEVIN MCNULTY, U.S.D.J.:**

This action is the latest action brought by similar parties to recover damages in connection with the shipping, export, repair, and resale of boats and automobiles. It is an object lesson in what can happen when parties fail to define their relationship in a written contract or otherwise. Having failed to allocate the risks in advance, these parties are trying to do it in retrospect.

In essence, these parties have been litigating the failure of their business relationships in various forums, involving various parties, for over seven years.

1

*See, e.g.*, *Mavl Capital, Inc. v. Marine Transp. Logistics, Inc.*, No. 13-CV-7110(PKC)(RLM) (E.D.N.Y.); *Crocus Investments, LLC and Crocus FZE v. Marine Transport Logistics, Inc., Aleksandr Solovyev a/k/a Royal Finance Group Inc.*, (Federal Maritime Commission Dkt. No. 15-04); *MAVL Capital, Inc., IAM & AL Group Inc., and Maxim Ostrovskiy v. Marine Transport Logistics, Inc. and Dimitry Alper* (Federal Maritime Commission Dkt. No. 16-16).

In this action, the Plaintiff, World Express & Connection, Inc. ("World Express"), filed a Complaint seeking storage and other related charges for three boats owned by Defendants, Crocus Investments, LLC ("Crocus LLC"), Crocus FZE, Alexander Safonov, and Middle East Asia Alfa FZE ("Middle East FZE"). (DE 1)

Those four Defendants then filed a Third-Party Complaint and Counterclaim to recover damages associated with these boats and the purchase, storage, shipping, and repair of two automobiles. (DE 11, DE 16, 17) The Third-Party Complaint is asserted against Marine Transport Logistics, Inc. ("Marine Transport"), Royal Finance Group Inc. ("Royal Finance"), Aleksandr Solovyev, Car Express & Import Inc. ("Car Express"), Alla Solovyeva, Raya Bakhirev, Roman Chernin, and Vadim Alper (collectively, "Third–Party Defendants").

Now pending before the Court are cross-motions for summary judgment and a motion for sanctions. (DE 187, DE 188, DE 189)

Plaintiff/Third-Party Defendants (with the exception of Mr. Alper) move for summary judgment requesting that all of Third-Party Plaintiffs' claims be dismissed. (DE 187)

Defendants/Third-Party Plaintiffs cross-move for summary judgment on the claims they assert in their Third-Party Complaint and move to dismiss both counts of the Complaint.

For the reasons explained herein, I will grant in part and deny in part the motions for summary judgment. I will deny the motion for sanctions.

I.    **Summary Judgment: Legal Standards**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has

created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

That the matter comes before the Court on cross-motions for summary judgment does not affect the analysis:

> This [Rule 56] standard "does not change when the issue is presented in the context of cross-motions for summary judgment." [quoting *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987)]. When both parties move for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016).

*Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) That one of the cross-motions is denied does not imply that the other must be granted. *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015). Rather, "[i]t is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment

unless one of the moving parties is entitled to judgment as a matter of law upon the facts that are not genuinely disputed." *Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976).

Local Rule 56.1 states in part, "the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." Moreover, "[t]he opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."

Both Plaintiff/Third-Party Defendants and Defendants/Third-Party Plaintiffs run afoul of these rules. Plaintiff/Third-Party Defendants' motion for summary judgment makes little effort to inform the Court of all material facts necessary for resolution of their motion. (*See* DE 187-1; 187-2) Their moving brief—a brief that appears to simply build on the disjointed set of facts presented in the SOF—jumps into the issues in the middle and assumes the Court has all relevant information without providing that information. Moreover, the SOF contains legal conclusions that are not statements of fact and often summarizes allegations rather than citing the underlying evidence. (PSOF ¶¶ 6, 9, 11, 12, 17, 21) Plaintiff/Third-Party Defendants' responsive statement of material facts likewise fails provide evidence in support of its denials, speculates as to facts, and resorts to legal argument. (*See, e.g.*, PRSOF ¶¶ 12, 32, 61, 74, 76, 79, 83, 86, 113, 114, 133, 135, 138, 150, 153) Defendants/Third-Party Plaintiffs for their part respond to certain statements in the PSOF by proffering legal arguments or failing to cite to relevant evidence in the record. (*See, e.g.*, DRSOF ¶¶ 7, 8, 14, 15, 19, 20) Moreover, Defendants/Third-Party Plaintiffs, in their briefing, repeatedly assert facts without citation to any evidence or their SOF. (*See* DE 192, *passim*) I have

5

made every effort to avoid crediting factual statements of any party where they are not properly supported. *See* L. Civ. R. 56.1(a).

## II.    **Discussion**[1]

The parties have dumped hundreds of pages of documents into the record with little effort to outline a coherent summary. Accordingly, I provide below a summary of what I believe are the facts material to resolving the cross-motions for summary judgment.

### A.    **The Relevant Procedural History**

On November 18, 2015, Plaintiff World Express filed its Complaint. World Express alleged that it was "a warehouse and storage facility, offering paid storage services for automobiles, boats, and other vehicles that are being exported from or imported at Port Newark, New Jersey." (Compl. ¶ 7) It brought this lawsuit to recover unpaid fees that it alleged were incurred by Defendants/Third-Party Plaintiffs for services provided in connection with the purchase and shipping of three boats:  a 2011 Monterey 204, a 2009 Chaparral 190 SSI, and a 2010 Formula 34 PC. (*Id.* ¶¶ 9-12) World Express alleges that there are two sets of outstanding fees:

(1)    $5,500 from custom clearance and unloading fees associated with the Chaparral and Monterey boats. (*Id.* ¶ 16)

---

[1]    Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = The Complaint filed by Plaintiff World Express. (DE 1)

"PSOF" = Plaintiff/Third-Party Defendants' Statement of Undisputed Facts. (DE 187-1)

"DSOF" = Defendant/Third-Party Plaintiffs' Statement of Undisputed Facts. (DE 189-3)

"PRSOF" = Plaintiff/Third-Party Defendants' Responsive Statement of Fact in Opposition to Defendant/Third-Party Plaintiffs' Statement of Fact. (DE 193)

"DRSOF" = Defendant/Third-Party Plaintiffs' Responsive Statement of Fact in Opposition to Plaintiff/Third-Party Defendants' Statement of Fact. (DE 189-2)

(2)    $109,759.51 for the storage of the Formula boat. (*Id.* ¶ 18) World Express seeks to hold Defendants jointly and severally liable and to pierce the corporate veil to hold Defendant Alexander Safonov, the alleged "managing member, owner, and registered agent" of Crocus FZE and Crocus LLC, personally liable. (*Id.* ¶¶ 4, 29–32)[2]

Third–Party Plaintiffs then filed a complaint on September 21, 2016 against Third-Party Defendants Marine Transport, Royal Finance, Aleksandr Solovyev, Car Express, Alla Solovyeva, Raya Bakhirev, Roman Chernin, and Vadim Alper. (DE 17) The Third–Party Complaint alleges six Counts: (1) fraud, (2) civil conspiracy, (3) breach of contract, (4) unjust enrichment, (5) quantum meruit, and (6) account stated. (*Id.*) Fraud is also asserted against Plaintiff as a counterclaim.

On June 21, 2017, Third-Party Plaintiffs filed a motion for leave to file an amended complaint to include a claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8–1 *et seq* and additional factual allegations in further support of their existing claim of fraud. (DE 51). On October 10, 2017, Judge Hammer granted in part that motion and permitted the Third-Party

---

[2]    As discussed herein, prior to filing the Complaint in this action, the Crocus defendants filed a related complaint against Marine Transport, Royal Finance, and Aleksandr Solovyev before the Federal Maritime Commission (the "Commission") asserting claims under the Shipping Act of 1984. (Dkt. No. 15-04)

Plaintiff World Express repeatedly refers to the failure of Defendants/Third-Party Plaintiffs to assert, for example, fraud allegations like the ones here before the Commission. (PSOF ¶ 21) However, claims that fall outside of the Commission's jurisdiction cannot be heard by the Commission. "The law is settled that an administrative agency can exercise only those powers conferred on it by Congress." *Trans-Pacific Freight Conference of Japan v. FMB*, 302 F.2d 875, 880 (D.C. Cir. 1962). The Commission has jurisdiction over matters relating to "transportation by water of … cargo between the United States and a foreign country." 46 U.S.C. § 40102(6). That jurisdiction begins when a common carrier assumes responsibility for transportation of the cargo and ends when the cargo is delivered to the consignee at the place of destination contemplated by the contract of carriage. *See, e.g., Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd*, 543 U.S. 14, 23-27 (2004) (finding that federal maritime law applies to the inland portions of international shipments transported through bill of lading).

Plaintiffs to assert additional factual allegations in support of their fraud claim, but otherwise denied the motion to add an NJCFA claim. (DE 74; DE 75)

After the close of discovery on December 1, 2018, Plaintiff/Third-Party Defendants moved for summary judgment on the Counterclaim/Third-Party Complaint. (DE 162) On January 25, 2019, Third-Party Defendant Alper filed a motion for summary judgment. (DE 166) Then, on March 20, 2019, Defendants/Third-Party Plaintiffs filed a cross-motion for summary judgment. (DE 173) Judge Hammer administratively terminated all three motions pending settlement discussions. (DE 182) After those discussions failed, all parties except for Mr. Alper renewed their motions for summary judgment.

### B.   The Parties

Defendant/Third-Party Plaintiff Alexander Safonov "is the sole owner and decision maker of all corporate defendants/third-party plaintiffs (Crocus Investments, LLC, Crocus FZE, and Middle East Asia Alfa FZE)." (PSOF ¶ 3) The Crocus and the Middle East FZE entities were the entities through which Safonov acquired the at-issue boats and cars and intended to repair and resell them. There is a late-breaking dispute as to whether Middle East FZE is the correct entity, *see* Section III.B.i, p. 34, but I set that aside for the moment. Middle East FZE is an entity governed by the laws of Dubai. Andrey Tretiykov was an employee of Middle East FZE (DSOF ¶ 11), but Plaintiff adds that Tretiykov's son was a co-owner of Middle East FZE and Safonov and Tretiykov were really business partners. (PRSOF ¶ 11)

Third-Party Defendant Marine Transport is a licensed "non-vessel operating common carrier" located in Bayonne, New Jersey. (DSOF ¶¶ 2-5) Marine Transport provided freight forwarding and logistics services to customers all over the world, including certain defendants located in Dubai. (*Id.*) During the relevant time period, Marine Transport used Plaintiff World Express as its container freight station/container yard ("CFS/CY"). (*Id.* ¶ 15) Marine Transport and World Express are both located at the same location and share an office: 63 New Hook Road, Bayonne, New Jersey. (*Id.* ¶ 3; DE 189-9)

Aleksandr Solovyev, his ex-wife, Alla Solovyeva, as well as Third-Party Defendants Bakhirev, Chernin, and Alper were individuals who at various points held positions at World Express and/or Marine Transport. (DSOF ¶¶ 19-25)

Bakhirev was the President and Owner of Plaintiff World Express from 2010-2016. (DSOF ¶ 39; PRSOF ¶ 39) In 2016, Chernin became the owner of World Express after Bakhirev transferred the company to him. (DE 189-1 at 28-29; DSOF ¶¶ 20, 22) Chernin resigned in December 2016 at which point Bakhirev took back ownership of World Express. (DSOF ¶ 22) Solovyev was not an owner or officer of World Express during the relevant time period, but he oversaw operations. (*Id.*) During most of this time period, Bakhirev was the general manager of Marine Transport. (*Id.* ¶¶ 25-28)

Mr. Alper (Solovyeva/Solovyev's son-in-law) was the general counsel of Marine Transport from 2009 until 2012, at which point he became the director of operations for Marine Transport until April 2015. (*Id.* ¶¶ 42–44; *see also* DE 189-22)

Ms. Solovyeva owns Marine Transport. (*Id.* ¶¶ 45-47; PRSOF ¶¶ 45-47) The parties disagree as to whether Mr. Solovyev is also an owner of Marine Transport. Plaintiff points to a 2017 annual report listing Alla Solovyeva as the sole owner of Marine Transport. (PSOF ¶ 45) In proceedings before the Federal Maritime Commission, Mr. Solovyev stated that he was not a managing member or owner of Marine Transport, but at times exaggerated his relationship with Marine Transport for business purposes. (*See* DE 190-5 at 27 (responses to proposed findings of fact)) Defendants, however, contend that there is some evidence indicating that Mr. Solovyev was a part owner, at least as of 2015. (DSOF ¶¶ 45–47 (citing exhibits located at DE 189-22 (Certification of Vadim "Dimitry" Alper) to DE 189-24 (Union County Prosecutor's Office Report on Marine Transport)))

These same documents indicate that Mr. Solovyev is the sole owner, officer, and director of at least two additional entities, Defendants Royal

Finance and Car Express. (*Id.*; *see also* DE 187-11 at 11) Car Express is a car dealer which purchases automobiles and boats from auctions at the requests of its customers. Here, Car Express facilitated the purchase of the at-issue boats from an auction company, Copart, and, according to Defendants, facilitated the purchase of the at-issue vehicles. (*Id.* ¶ 17) Royal Finance issued the invoices for these items and generally issues invoices and collects payments for the services provided by the Solovyev and Solovyeva owned entities. (*See, e.g.*, DSOF ¶¶ 125-129)

### C.    The Boats

In April and May 2013, Defendants purchased from Solovyev's company, Car Express, the Monterey and Chaparral boats won at a Copart auction. (DSOF ¶¶ 16, 79, 91, 95) Between March and May 29, 2013, Safonov purchased 11 boats using Solovyev/Third-Party Defendants' services. (*Id.* ¶¶ 18, 83 (citing "Exhibit K" pp. 7-9, an email and spreadsheet mostly in Russian))[3]

---

[3]    Counsel for Defendants/Third-Party Plaintiffs submits a notarized translation of these documents in which Counsel avers that he is fluent in Russian. (DE 189-1 ("Nussbaum Decl.") at 3, 12-17) The email attached to the spreadsheet, says Counsel, states:

> Hello. In the original invoice, the price for the boats is 28,192 US but you wrote to me 29,192 US – you probably made a mistake. You have my credit of 15,207 US (look at the file). Where are the documents regarding the Regal, I only have a copy of the dock receipt and invoice, is this enough?

(Nussbaum Decl. at 3) The email attaches a document titled "Completed purchases.doc", which is the spreadsheet submitted by Defendants as part of Exhibit K. The spreadsheet lists 11 boats purchased between March and May 2013, including the Chaparral and Monterey boats, and indicates that all the boats were paid for. (*Id.* at 12-17)) The spreadsheet also shows a $15,207 credit remaining as a balance in Defendants account from Marine Transit. (*Id.*) Mr. Nussbaum certified before a notary that he is fluent in Russian and English and that the translations he provided were true and accurate. Plaintiff's response in its PRSOF states: "Disagree. It is not clear whether this involves all of the subject boats. Objection on the basis of the translation not being certified." (PRSOF ¶ 83) Plaintiff does not offer a differing translation of these documents.

Through Third-Party Defendant Marine Transport, Defendants shipped the Monterey and Chaparral boats to Dubai for repair and resale. (*Id.* ¶¶ 108-112) These boats were repaired in Dubai. (*Id.* ¶¶ 115-117) Safonov and an employee of Middle East FZE, Andrey Tretiykov, contacted Alex Solovyev in order to export the boats back to the United States because Middle East FZE was not able to sell them in Dubai. They were sent back to Marine Transport in July 2014. (*Id.*; PSOF ¶ 19)

In August 2013, a third boat, the Formula boat, was purchased by Defendants. (DSOF ¶¶ 126-29) There appears to be no agreement as to what Defendants intended to do with the Formula boat upon purchasing it. World Express states that it was purchased to repair and then rent to customers in Florida. (PRSOF ¶ 124) Defendants state that it was purchased with the intent of sending it to Dubai for repair and resale. (DSOF ¶ 124) In any event, it is undisputed that on August 7, 2013, Royal Finance sent an invoice, #1189AT, to Defendants for $59,780 ($56,280 for the boat and $3,500 for delivery) and that Defendants paid $59,780 to Royal Finance. (DSOF ¶¶ 126-28; PRSOF ¶¶ 126-28) Also included on the #1189AT invoice were the following additional charges: $12,000 for loading/shipping to Dubai, $500 for commission, $500 for documentation, and $4,500 for a trailer. (DSOF ¶ 127; PRSOF¶ 127) Defendants did not pay the $12,000 for loading/shipping to Dubai. (DSOF ¶ 133) On August 13, 2013, Defendants then wired an additional $5,000 to Royal Finance to pay for the $4,500 trailer and the $500 shipping documentation fees. (DSOF ¶ 129; PRSOF ¶ 129) Defendants were then charged for an additional trailer, and they paid $4,500 for that trailer (DSOF ¶¶ 131-134; DE 191-7 (showing three wire transfers for $59,780, $5,000, and a $4,500 one on December 5, 2013 for "PAYMENT FOR BOATTREILER[sic].")) Plaintiff agrees that Crocus wired the $4,950 payment but denies that both the $5,000 and $4,950 payments were received for the trailers and points to a Crocus Exhibit "GGG" page "DEF0047" as proof. (PRSOF ¶¶131-133 (admitting the $4,500 was wired by Crocus)) However, this document is not in the record and the basis for Plaintiff's objection regarding the $4,950 payment is unclear.

The parties disagree as to the cause for the delay in shipping the boat. Defendants contend that there were difficulties with the trailer needed to ship the Formula boat. (DSOF ¶¶ 129-48) As noted above, Defendants contend that they paid for two separate trailers to ship the boat, but that Third-Party Defendants waited for months to tell them that they could not ship the Formula because these trailers were insufficient. (*Id.*) Moreover, Defendants point out that Third-Party Defendants never produced any proof of ownership or a valid "VIN" Number for the trailers. (*Id.*) Without proof of title to the trailers, say Defendants and their expert, the boat could not be shipped internationally anyway, so the six-month delay in shipping the boat was Plaintiff/Third-Party Defendants' fault. (*Id.*) Moreover, Defendants also claim that the title to the Formula itself was invalid, as Car Express never obtained a U.S. Certificate of Title. (DSOF ¶ 144) Finally, Defendants contend that they had already overpaid Marine Transport for its services, as they had a $15,207 credit on their account and then, for unexplained reasons, paid an additional $8,400 on August 15, 2013, for the shipment of the boat to Dubai. (DSOF ¶¶ 83, 155) Thus, all of Defendants' obligations with respect to shipping the Formula had been met. The real reason for the delay in shipping, say Defendants, was that Plaintiff/Third-Party Defendants could not locate a proper trailer for the Formula. (*Id.* ¶¶ 83-84; *see also* n. 3, *supra*)

Plaintiff/Third Party Defendants disagree and claim that no title for the trailer was required. (PRSOF ¶ 138) Plaintiff/Third Party Defendants cite no substantial evidence or expert testimony for the contention that they did not need original title for the trailer. (*Id.*) They note only they never acquired or presented proof of original title for the trailers used to ship the Monterey and Chaparral boats. (*Id.* ¶ 144) World Express does not outright deny that Defendants had an $15,207 credit, but denies that the $8,400 paid in August 2013 was for shipping the Formula. (*Id.* ¶¶ 83, 155) Instead, World Express points to Marine Transport's invoice for this August 2013 transaction, which

shows that the funds were for the shipment of a different boat with "Vin(s): 47GAA2725EB0000007, SERT5333J405." (*Id.* ¶ 155 (citing DE 193-19))

Be all that as it may, on February 13, 2014, Mr. Safonov wrote to Mr. Solovyev and provided new shipping instructions, this time to send the Formula to Florida. (DSOF ¶¶ 141-42; PRSOF ¶¶ 141-42; PSOF ¶ 20) The parties disagree as to what caused Mr. Safonov to change his mind about shipping the boat to Dubai. Safonov contends that he began to suspect Solovyev was a crook and he did not want to deal with him anymore. (DSOF ¶ 142) World Express contends that Mr. Safonov's testimony indicates that he did so as retribution for a separate issue that arose with a Mercedes vehicle (as outlined below). (PRSOF ¶ 142). In one of the actions before the Commission, the parties suggested that Mr. Safonov began to mistrust his business partner at Middle East FZE, Tretiykov, and therefore did not want to ship the boat there. (*See* F.M.C. Dkt. No. 15-04 at DE 73 at 4-5) In any event, the parties agree that in February 2014 World Express and/or Marine Transport were no longer preparing to ship the Formula internationally.

Mr. Safonov then sent follow up emails in July 2014 and August 2014 requesting that all three boats be shipped to Florida. Plaintiff/Third-Party Defendants' relationship with Defendants/Third-Party Plaintiffs then deteriorated further and, apparently, broke down over the issue of storage fees.

As to storage fees, Marine Terminal, rather than World Express, communicated with Defendants. Marine Terminal's tariff as applicable to boats being *exported* stated: "Carrier provides 30 calendar days free storage prior for vehicles, trucks and boats received for US export shipment at its CFS/CY as listed herein. Beyond 30 days, storage charges per day apply as follows: A. STORAGE CHARGES AT BAYONNE, NJ ... Boats: USD 20 per day." (DSOF ¶ 76; DE 187-11 at 19; DE 190-11) Marine Terminal's "tariff provides that MTL's container freight station/container yard (CFS/CY) 'may be a designated warehouse. Shipper, at its own expense, will deliver its vehicle to [MTL's] designated warehouse for loading into the container for movement to the U.S.

13

load port.' (CX I 78.)" and that Marine Terminal "uses World Express as its CFS/CY." (DE 187-11 at 12; DSOF ¶ 15)

World Express has produced invoices in this action that purport to be for the storage of the Formula boat. However, these invoices from World Express were issued to Marine Transport in 2014. For example, World Express issued invoice numbers 40761-1 and 50677-1 to Marine Transport, which then paid these invoices. (DSOF ¶ 41; PRSOF ¶ 41) Invoice 50677-1 is an invoice from World Express to Marine Transport dated February 14, 2014 for six months of "storage 8/12/13 - 02/14/14 2010 Formula Boat V#..70C010" for $19,587.66. (DE 191-12) The invoice lists the rate as $105.31 per day. (*Id.*) The invoice was paid four days later on February 18, 2014. (*Id.*; *see also* DE 190-5 at 34 (response to proposed findings of fact in F.M.C. proceeding 15-04 No. 31 admitting Marine Transport paid for the storage of the boats)) Invoice 40761-1 is an invoice from World Express to Marine Transport dated June 27, 2014. (DE 188-4 at 159) It is for "storage 2/15/14 - 06/30/14 2010 Formula Boat v#70C010" for $14,322.16. (*Id.*) Curiously, the "PAID" stamp on the invoice is for June 26, 2014, the day *before* the date of the invoice. All told, Marine Terminal paid World Express nearly $34,000 for the storage of the Formula. Mr. Alper testified that World Express would bill Marine Transport, which would officially pay these invoices and issue checks. (DE 189-6 (Alper Transcript) pp. 99) However, Mr. Alper also testified that World Express would issue invoices to Marine Transport when it needed to balance its books. (*Id.* pp. 100-101) Marine Transport would then remit a check to World Express. (*Id.*)

In August 2014, Safonov sent Solovyev a letter demanding return of the boats. (DE 190-5 at 32) Also in August 2014, Royal Finance issued an invoice to Defendants seeking $39,409.39 in storage fees. (DE 187-8 at 10) Royal Finance calculated the storage fees the same way World Express did, that is, at a rate of $9.60 per linear meter per day, which amounted to $105.31 per day. (*Id.*) There is no documentation in the record between World Express and Defendants that indicates that World Express would be charging Defendants

for storage fees. Nor have I been able to locate a copy of the invoice actually sent to Defendants by Royal Finance (as opposed to the invoice sent by World Express to Marine Transport).

### D.   The Vehicles

The second set of transactions here concerns two vehicles, a 2006 Mercedes SL65 and a 2011 Porsche Panamera, that Third-Party Plaintiffs allegedly purchased from Third-Party Defendants. As in the case of the boats, there have been several lawsuits surrounding the sale and transport of the Mercedes and Porsche.

In 2014, nonparties MAVL Capital Inc., IAM & AL Group Inc., and Maxim Ostrovskiy filed a complaint in the Eastern District of New York against Marine Transport, Alper, Solovyev, Royal Finance, and Car Express. *See Mavl Capital, Inc. v. Marine Transp. Logistics, Inc.*, No. 13-CV-7110(PKC)(RLM), (E.D.N.Y.). The allegations in that action were that

> [b]etween January and August of 2013, Plaintiffs[MAVL, IAM & AL, and Ostrovskiy] contracted with MTL to ship vehicles abroad and, as a condition of that agreement, agreed to pay certain commissions, fees, and financing costs to RFG for services provided by both MTL and Car Express. (Compl., Dkt. 1 at ¶¶ 45-51.) In the summer of 2013, the parties' relationship soured after Plaintiffs worked out a more favorable arrangement with another shipping company and notified Defendants of their intent to wind down their relationship. (*Id.* at ¶¶ 62-70.) Defendants, at that time, still had several of Plaintiffs' vehicles in their possession, including a 2006 Mercedes SL65 ("Mercedes") and a 2011 Porsche Panamera ("Porsche"), both of which Plaintiffs had previously retained Defendants to store, along with other property, until shipment by a third party. (*See id.* ¶¶ 64-65, 78-109.)
>
> When Plaintiffs demanded the return of that property, Plaintiffs alleged that the Defendants refused under the pretext of being owed payments to which they had no right under the parties' operative agreements. (*Id.* at ¶¶ 66-68.) For example, Plaintiffs allege that Defendants demanded inflated storage fees to which Plaintiffs had never agreed. (*See id.* at ¶ 66.) . . . Ultimately, Plaintiffs allege that when Plaintiffs refused to pay, Defendants obtained title to some of the property by asserting maritime liens and shipped some of the property overseas, without proper title,

including three of Plaintiffs' motorcycles, as well as the Mercedes and Porsche. (*See id.* at ¶¶ 83, 86-87, 91-92, 97-98, 103-04, 108-27.)

*Mavl Capital, Inc. v. Marine Transp. Logistics, Inc.*, No. 13CV7110PKCRLM, 2018 WL 1474175, at *2 (E.D.N.Y. Mar. 26, 2018), *aff'd sub nom. MAVL Capitial, Inc. v. Marine Transp. Logistics, Inc.*, 771 F. App'x 56 (2d Cir. 2019) ("EDNY Action"). Plaintiffs alleged several claims in the EDNY Action, including Shipping Act claims, RICO claims, and state law consumer and common law claims. Plaintiffs' federal claims were then dismissed and the Court directed Plaintiffs to show cause why the state law claims should not be dismissed. Instead of complying with that order, Plaintiffs filed a series of Rule 60 motions and then sought and were denied leave to amend their complaint to add Safonov and his related entities as plaintiffs. *Id.* at *4-*8. Currently, that matter is on appeal to the Second Circuit.

While the EDNY Action was proceeding, in 2016, MAVL Capital, IAM & AL, and Maxim Ostrovskiy filed an action before the Commission naming Marine Transport and Dmitry Alper as defendants. Apparently, in this second Commission action, plaintiffs asserted that around December 3, 2012 they sent the Mercedes to Marine Transport for storage. (*See* F.M.C. Dkt. No. 16-16, DE 1 (Verified Complaint) ¶¶ 27-30) Plaintiff agreed to pay Marine Transport $150 a month for storage of the Mercedes, the ultimate plan being that Marine Transport would ship the vehicle to Germany. (*See id.*; *see also* DE 7 (Verified Answer) ¶ 30; DE 15 (Initial Decision Partially Dismissing Complaint) at 9) The Porsche was purchased on April 22, 2013 and was destined for Kotka, Finland. (*See* F.M.C. Dkt. No. 16-16, DE 1 (Verified Complaint) ¶¶ 37-40)

In the Commission action, Defendants were alleged to have unlawfully converted the vehicles while they were being stored, shipping them instead to the United Arab Emirates without the consent of Plaintiff. (*Id.* ¶¶ 31-33, 41-43) The claims as to the Mercedes were then dismissed by the administrative law judge because they fell outside the jurisdiction of the Shipping Act of 1984. (F.M.C. Dkt. No. 16-16, DE 15 (Initial Decision Partially Dismissing Complaint)

at 13-21) The ALJ found that any alleged conversion happened as a result of storing the vehicle in Marine Transport's warehouse rather than as a result of exporting the vehicle internationally by water. (*Id.*) The claims regarding the Porsche were not dismissed. In February 2017, plaintiffs filed exceptions to the ALJ opinion. A decision remains pending.

As to this action, it is undisputed that the Mercedes and Porsche were being stored by Marine Transport. Marine Transport, says Defendants, was charging non-parties IAM & AL Group and Maxim Ostrovskiy a monthly storage charge for these vehicles. (DSOF ¶ 56) On June 12, 2013, nonparty Ostrovskiy owed $2,354 in unpaid storage fees. (*Id.*) By March 2014, the outstanding balance had been reduced to $900. (*Id.*)

At some point while these storage fees were accruing, Third-Party Defendants came into possession of the vehicles. There are several competing stories as to how this occurred.

One theory is that the Plaintiff/Third-Party Defendants purchased the Porsche and Mercedes at auction, although the facts concerning the auction remain murky and disputed. Defendants/Third-Party Plaintiffs point to documents that they were given from Solovyev and Alper that purport to show that Car Express purchased the Porsche on May 28, 2013 and the Mercedes on June 7, 2013, both through Copart auctions. (DSOF ¶¶ 61, 71 (citing "Exhibit DD" (DE 190-4) Copart invoices for the two vehicles)) However, Copart has denied ever selling these vehicles and denies that the documentation provided to Defendants/Third-Party Plaintiffs was generated by Copart. (*Id.*) Thus, Defendants contend that the vehicles were never part of Copart's inventory and deny that Third-Party Defendants ever purchase these vehicles from Copart. (DSOF ¶ 62) In their version, the vehicles were owned by Ostrovskiy and IAM&AL and were converted by Marine Transport before being improperly sold to Defendants/Third-Party Plaintiffs. (*Id.*)

Plaintiff/Third-Party Defendants do not outright dispute these statements. (PRSOF ¶¶ 48, 62, 71) Instead, they defend the transactions by

17

first stating that the transactions were legitimate because the vehicles successfully passed customs when being exported, and because Middle East FZE was the one listed on all shipping documents as the one to receive the vehicles. (*Id.* ¶ 48) Plaintiff/Third-Party Defendants also defend the transactions by pointing to "Ex. 5" a printout of a $36,440.00 "wire transfer" to IAAI Buyer, another Solovyev entity, for "Stock # 11030324." (*Id.* ¶ 62 (incorporating a reference to Ex. 5 (DE 193-5))) There is no indication what this wire transfer is for other than a handwritten note on the printout that reads: "payment to IAAI for Porsche Panamera." (*Id.*) A similar document is not provided for the Mercedes. But in any event, Plaintiff contends that this wire transfer is proof that the vehicles were legitimately acquired by Marine Transport at an IAA Buyer auction. (PRSOF ¶¶ 62, 71; PSOF ¶ 15) Plaintiff points to a May 6, 2013 bill of lading transporting the Porsche on behalf of IAA from California to Marine Transport in New Jersey (*see* DE 187-13) and a salvage certificate for the Porsche indicating that the owner of the Porsche is IAA. (*Id.*) Two salvage certificates are provided for the Mercedes that appear to list both IAM & AL and IAA. (*Id.*) As to the Copart invoices, Plaintiffs contend that there is no "proof in admissible form that Mr. Solovyev sent the purported invoice from Copart." (PRSOF ¶ 123)

A third and contradictory story has also emerged. In response to interrogatories propounded by plaintiffs in the EDNY Action (plaintiffs there being MAVL Capital, IAM & AL and Ostrovskiy), Alla Solovyeva declared under penalty of perjury that the Mercedes and Porsche were exported to Dubai "pursuant to Clause 15 of the MTL House Bill of Lading ['LIEN'] for unpaid freight and other charges owed by plaintiffs." (DE 189-26 ("Exhibit W") at 3)[4]

---

[4]    Whether this was a proper transaction remains to be seen as the EDNY and Commission actions remain ongoing. However, the ALJ in the 16-16 action noted that the basis for this lien rests on shaky ground as no party could produce a bill of lading incorporating "Clause 15" into the relevant documents. (*See* F.M.C. Dkt. 16-16 at DE 15, p. 17-19) The court then noted that based on the allegations in the Verified Complaint, Marine Transport may have had a warehouse lien or under New Jersey law it was possible that Marine Transport had converted the Mercedes.

Thus, according to this third story, the cars were never purchased at auction and instead were legally possessed and shipped by Third-Party Defendants as a result of Marine Transport's liens.

Regardless of how Marine Transport came to possess the vehicles, it is uncontested that Mr. Solovyev shipped both vehicles to Middle East FZE. (Again, there is a general sense that the vehicles went to Mr. Safonov, but a dispute as to whether FZE is the correct "Middle East" entity. *See* p. 34, *infra*.). They were shipped to Dubai for sale in Dubai. (DE 187-11 at 19) Defendants contend that they did not request to buy the Mercedes and Porsche, but rather that Middle East received the cars at the request of the Third-Party Defendants (namely, the Solovyevs). (DSOF ¶¶ 67-69) At Third-Party Defendants' direction, Middle East FZE paid $50,000 to cover the cost of customs duties, repair, and storage of the vehicles. (*Id.*) The plan was for the parties to then sell the vehicles and split the profits.

Plaintiff/Third-Party Defendants' denial of these allegations appears to consist of a claim that Alla Solovyev had nothing to do with this transaction and that there is no evidence that Middle East FZE repaired the Mercedes. (PRSOF ¶¶ 67-69) They dispute that the cars were sent at the direction of Mr. Solovyev and dispute that they owe $50,000 in fees. (*Id.*) As to repairs of the Porsche, Plaintiff points to a receipt from August 2013. (PSOF ¶ 14) Defendants dispute this invoice and claim that they still had to repair the Porsche once it arrived in Dubai. (DRSOF ¶ 14)

At some point after the cars arrived in Dubai in August 2014, the U.S. title to the cars was changed to United Arab Emirates titles that listed a separate entity, Middle East Asia Alfa FZC, as the owner of the cars. (DSOF ¶ 69; DE 190-7)

Ultimately, the Mercedes and Porsche were disposed of, but the circumstances remain disputed and unclear. Third-Party Defendants claim that Tretiykov stole the vehicles from Middle East FZE's warehouse and sold them, ultimately splitting the profits with Solovyev and Marine Transport. (DSOF ¶ 69 (citing the declaration of Alexander Safonov); *see also* DE 192 at

13-14) The declaration of Mr. Safonov, which Defendants/Third-Party Plaintiffs point to as evidence that supports these allegations, does not in fact state that Tretiykov stole the vehicles and then sold them. Defendants further claim that they opened an investigation into Mr. Tretiykov in Dubai, but the document cited ("Exhibit HH", DE 189-8) is primarily in Arabic (no translation is furnished), does not appear to mention Mr. Tretiykov, and lists as its subject "betrayal of trust." (*Id.*) The Mercedes appears to have then been sold for $3,800 in Dubai, at least according to Ms. Solovyeva's interrogatory responses. (DE 189-26 ("Exhibit W") at 2) Elsewhere, Royal Finance claims the car was sold for $3,500. (DE 190-2 at 10)

Each side claims that there are no material disputed issues of fact and demands summary judgment.

## III.   Analysis

### A.   Counts 1 and 2 of the Complaint

In Count 1 of the Complaint, World Express seeks to recover two different fees: (1) $5,500 "for payment made by MTL of the custom clearance and unloading of the 2008 Chaparral boat and 2011 Monterey boat and transport of the two boats to WEC"; and (2) storage fees for the Formula boat. World Express asserts causes of action for common law bailment, quantum meruit, and/or breach of contract.

Defendants/Third-Party Plaintiffs move for summary judgment, asserting that there has been a failure of proof as to both sets of fees. First, Defendants assert that there is no proof that Marine Transport made this $5,500 payment and that World Express therefore did not reimburse Marine Transport for these fees. (DSOF ¶ 121) World Express concedes that it did not provide services to support the $5,500 allegation in the Complaint and therefore did not reimburse Marine Transport for $5,500 associated with the boats. (PRSOF ¶ 121) Accordingly, there is no material dispute concerning this $5,500 set of fees and I will dismiss Count 1 insofar as it seeks to recover $5,500 from Defendants in connection with the Chaparral and Monterey boats.

Second, the Complaint seeks approximately $110,000 in unpaid storage fees associated with the Formula boat.

Defendants contend that there is no evidence that they had a relationship with World Express and that Plaintiff has failed to produce any documentation created at the time the Formula arrived at Marine Transport's facility that entitles World Express to storage fees for the Formula boat. (DE 192 at 30) To this, there is less than meets the eye. Defendants dealt directly with Marine Transport, but seem to have been well aware that Marine Transport did not store boats itself, but used the services of World Express.[5]

Defendants argue that World Express lacks standing to pursue this matter. (*Id.*) In that regard, they point to the testimony of former World Express owner, Raya Bakhirev, who admitted that there was no direct relationship between World Express and Defendants, as World Express's only client is Marine Transport:

> Q. If a party wants to provide shipping instructions to your company, how do they usually do it?
>
> A. We have only one client, and we receive instructions from that client for loading up containers, and that's it.
>
> Q. So as far as you know, WEC does not have any kind of a relationship with Mr. Safonov?
>
> A. We do not have a client like that.
>
> Q. So you do not have a relationship of any kind with Mr. Safonov for WEC -- I'm sorry, I will make the question clear. So WEC does not have any relationship with Mr. Safonov; is that your testimony?
>
> A. Yes.
>
> . . .

---

[5]    Defendants/Third-Party Plaintiffs acknowledge in multiple filings that World Express was no stranger. They state that World Express and not Marine Transport was the entity that stored the boats. (*See, e.g.*, DSOF ¶ 15 ("MTL uses World Express as its CFS/CY. (See, page from MTL's Tariff produced by MTL in FMC Docket No.: 15-04 marked as RESP 073 and bates numbered DEF1189, annexed hereto as Exhibit "L").""))

Q. So you testified that MTL was WEC's only client; is that correct?

A. Yes.

(DE 189-5 ("Bakhirev Tr. II") pp. 66-72, 118)

Defendants say that the only storage fees they were made aware of consisted of the published tariffs of Third-Party Defendant Marine Transport— not World Express—which has not moved to recover any storage fees. They point to Marine Transport's posted tariffs: "Carrier provides 30 calendar days free storage prior for vehicles, trucks and boats received for US export shipment at its CFS/CY as listed herein. Beyond 30 days, storage charges per day apply as follows: A. STORAGE CHARGES AT BAYONNE, NJ... Boats: USD 20 per day." (DSOF ¶ 76; DE 192 at 33-35) However, Defendants dispute that even $20 per day is owed. Marine Transport and Mr. Solovyev, say Defendants, had an understanding that the boat was to be stored for free pending the sale of the Mercedes and Porsche. (DE 192 at 40). Defendants also cite certain testimony of Mr. Safonov before the Federal Maritime Commission (*See* DE 192 citing DE 189-13 pp. 66-67)).[6]

Alternatively, Defendants appear to be arguing that the parties were negotiating for the shipment of the Formula to Dubai from August 2013 until February 13, 2014 but never came to any agreement to export the boat. (DSOF ¶¶ 124 – 141) Then, on February 13, 2014, they seem to agree, Mr. Safonov emailed Mr. Solovyev to direct him to ship the Formula to Florida rather than Dubai. (DSOF ¶ 141; PRSOF ¶ 141) Thus, at a minimum, as of February 13, 2014, Defendants had no intention of exporting the boat. To the extent that any Marine Transport tariffs would be applicable, say Defendants, those tariffs only applied to the Formula from August 2013 to February 14, 2014.

---

[6]     This appears to be an incorrect reference as the testimony cited does not pertain to whether the boats would be stored for free. Instead, it appears that Mr. Safonov testified in this action that the parties understood the boats would be stored for free in exchange for Mr. Safonov shipping, storing, and repairing the Mercedes and Porsche vehicles in Dubai. (DE 187-6 ("Safonov Tr.") pp. 70-73)

World Express's opposition is less than clear. World Express does not deny that Marine Transport's tariffs during the relevant period were $20 per day for boats awaiting international export. Instead, World Express states that these fees would be inapplicable because there was never an agreement or intent to send the Formula boat internationally. (*See* PRSOF ¶ 124 ("In this factual assertion as to the Formula boat, Mr. Nussbaum says that his client (Mr. Safonov of Crocus) had 'the intention of sending it to Dubai for repair and resale.' However, at Mr. Safonov's deposition as part of the proceedings before this Court, Mr. Safonov says something completely different" and points to testimony from Mr. Safonov indicating that he intended to repair the boat in the US and rent it out there))

As to whether it offered to store the Formula for free, World Express just points to Mr. Safonov's testimony in this action where he testified that it was assumed that there would be no storage charges because the boats were to be sold or shipped immediately to Florida. (*See* DE 194 at 4-5) World Express then fixates on which individual instructed the boats to be shipped where, although it is unclear what this has to do with storage fees. (*Id.* at 5 ("Similarly, as to the subject Formula boat, it was Mr. Safonov, and not Aleksandr Solovyev, who instructed to ship this boat to Florida. (Plaint. Br. Ex. 8 at 17-18, paragraphs 91-92, 95)") At no point does World Express point to any documentation or evidence establishing in advance the storage fees it intended to charge Defendants. Testimony in the record by Ms. Bakhirev confirms that it would have been Mr. Solovyev who would have provided a storage quote to Defendants. (Bakhirev Tr. I at 139 ("Q. What is the range of fees? A. Depends on the space that boat takes. It's just calculated based on the size. Q. Who provides the quotes to customers? A. Aleksandr Solovyev. Q. Not you? A. No.")) However, not even World Express submits evidence establishing that Mr. Solovyev communicated with Mr. Safonov regarding storage of the Formula.

### i. Breach of Contract

From all of this, I cannot discern any offer and acceptance on reasonably specific terms. To the extent that this action is one for breach of contract, then, I will grant summary judgment to Defendants. There is no evidence establishing that, prior to accepting the Formula boat into its warehouse, World Express arrived at any agreement with Defendants to store the Formula boat, or establishing the charges therefor.

"For a contract to be enforceable there must be a meeting of the minds for each material term to an agreement." *In re Rappaport*, 517 B.R. 518, 529 (Bankr. D.N.J. 2014) (internal quotations and citations omitted). The requirements of a meeting of the minds "is 'an essential element to the valid consummation of any contract.'" *Id.* at 530 (quoting *Ctr. 48 P'ship v. May Dep't Stores Co.*, 355 N.J. Super. 390, 406, 810 A.2d 610 (N.J. Super. Ct. App. Div. 2002)). This requirement is met when "there has been a common understanding and mutual assent to all the terms of a contract." *Id.* A contract is not legally enforceable without this "common understanding" of the terms. *Marcangelo v. Boardwalk Regency Corp.*, 847 F.Supp. 1222, 1229–30 (D.N.J. 1994) (quotation omitted). To have a meeting of the minds, both parties must manifest that they understand what each is agreeing to do or not to do, and the "contracting party is bound by the apparent intention he or she outwardly manifests to the other party." *Brawer v. Brawer*, 329 N.J. Super. 273, 283, 747 A.2d 790 (N.J. Super. Ct. App. Div. 2000) (quoting *Hagrish v. Olson*, 254 N.J. Super. 133, 136, 603 A.2d 108 (N.J. Super. Ct. App. Div. 1992)). "Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280, 284 (1992) (citing *Heim v. Shore*, 56 N.J. Super. 62, 72–73, 151 A.2d 556 (N.J. Super. Ct. App. Div. 1959) (holding agreement unenforceable because parties did not agree on terms of payment, principal amount of mortgage, due date, and interest rate)).

Contract formation and essential terms rest on propositions of fact which must be assessed on a summary judgment standard. *See McDonnell v. Engine Distributors*, 314 F. App'x 509, 511 (3d Cir. 2009) (citing *Burlew v. Hepps*, 6 N.J. Super. 16, 19 (App. Div. 1949)) ("The formation of an enforceable contract is a question of fact"); *American Lumber & Mfg. v. Atlantic Mill & Lumber Co.*, 290 F. 632, 634 (3d Cir. 1923) (recognizing that "[w]hen the evidence is conflicting it is for the jury to determine whether a contract does in fact exist, and, if so, what are its terms?"). When parties perform under a contract without objection, a court will sometimes find agreement—*i.e.,* the Court will infer what the parties agreed to do based on what they did. *See James v. Zurich-Am. Ins. Co. of Illinois*, 203 F.3d 250, 255 (3d Cir. 2000) (stating that where an agreement is silent on a particular term, a course of dealing may fill the void); *Trianco, LLC v. Int'l Bus. Machines Corp.*, 583 F. Supp. 2d 649, 662 n.9 (E.D. Pa. 2008), *aff'd*, 347 F. App'x 808 (3d Cir. 2009) ("[A] party's partial performance can be used to show intent to be bound to an agreement."). Should a party thereafter fail to perform, a breach may be found.

Here, the parties appear to have had a practice or plan under which boats would be located and then expeditiously shipped elsewhere in the hopes that they would be quickly repaired and sold for profit. Storage, then, was apparently not much of an issue. For reasons unknown to this Court, at some point around August 2013, the plan began to break down. Now each side seeks to unwind the relationship while charging the other for failed efforts. But the parties cannot cover themselves retroactively by positing what they now think would have been a fair agreement. Here the evidence fails to demonstrate that there was any contemporaneous agreement that establishes that Defendants agreed to pay World Express a specific daily fee for the storage of the Formula. The only document outlining storage fees, if any, consists of Third-Party Defendant Marine Transport's posted tariffs for storing boats in anticipation of export. But even World Express seemingly concedes that these tariffs are irrelevant to its claims here. (PRSOF ¶¶ 76-78) World Express has produced no

other documents establishing that, prior to the acceptance of the Formula into its warehouse, there was an agreement outlining what storage fees would be paid by Defendants for storage.

Accordingly, to the extent Count 1 seeks to recover approximately $110,000 in unpaid storage fees under a breach of contract theory of liability, that claim is dismissed.

### ii.  Common law bailment

Whether there is some other theory under which World Express is entitled to compensation for storage of the Formula boat is a separate question. One such theory is common law bailment. The parties dispute whether World Express acted as a bailee and, if so, whether it is entitled to damages. Because I find that material facts remain in dispute, I will deny both parties' motions for summary judgment with respect to Count 1 insofar as it asserts a bailment theory.

Plaintiff World Express argues that it acted as an actual or constructive bailee of Mr. Safonov's boats and therefore had authority to file this action for unpaid storage fees. (DE 194 at 10) Defendants argue that World Express does not have standing to pursue any claims because World Express is a sham entity and because Mr. Solovyev is not an officer or agent of World Express. (DE 192 at 28, 30-31) In any event, say Defendants, World Express never actually stored anything and Defendants never engaged their services; thus, in Defendants' view, there is no basis for World Express to recover under a bailment (or any) theory of liability. (*Id.* at 29)

Initially, I will deny Defendants' summary judgment motion insofar as it seeks to dismiss Count 1 based on World Express's lack of standing. While it is true that World Express's owner at the time, Ms. Bakhirev, did not sign off on Mr. Solovyev's initiation of the lawsuit, she has nevertheless pursued the claims here. Likewise, Mr. Chernin, the subsequent owner of World Express, agreed to continue with the action. (*See* 189-1 ("Chernin Tr.") pp.51-54) At his

26

deposition in February 2018, he affirmed that World Express was continuing to pursue its claims here. (*Id.*)

At any rate, I see no substantial evidence from either side that World Express is a sham entity or that it does not provide storage services. Defendants concede that "[Marine Transport] uses World Express as its CFS/CY," *i.e.*, its container freight station/container yard. (DSOF ¶ 15) World Express has its own website. (*Id.* ¶¶ 6-8) World Express has a board of directors and keeps minutes of meetings. (*Id.* ¶ 19) Defendants focus on testimony in Ms. Bakhirev's deposition which, ripped from its context, suggests that World Express is not a storage company. (*See, e.g.*, DSOF ¶ 80 (characterizing Ms. Bakhirev's testimony as stating that "Bakhirev . . . explains that WEC never accept automobiles for storage."); DE 198 at 16-17) But Ms. Bakhirev repeatedly explained how storage at World Express works and that they do, in fact, store boats and automobiles for Marine Transport. (*See* DE 189-4 ("Bakhirev Tr. I") at 137-139)[7]

---

[7]     The larger context of the testimony quoted by Defendants is:

Q. What are the daily charges to store a car for WEC?

A [Bakhirev]. It depends on whether the car is being shipped, or whether it's a boat or a car, and on average we have 30 days free, and then it's ten dollars a day after that.

Q. So let's say I wanted to store my car, and I'm not shipping it, what is my rate?

A. We will not take your car for storage.

Q. I'm sorry, going back again to your answer

. . .

Q. You said "it depends on whether the car is shipped?"

A. Yes.

Q. So there are some cars you store that are not shipped?

A. Sometimes clients refuse to ship the car.

Q. So they give you the car to hold and then they don't ship them?

A. Yes, that happens.

Q. What is the daily storage fee for a boat, is it different than a car?

I turn to the issue of whether World Express, in storing boats or vehicles, took on the status of a bailee. A bailment may be created by contract, either express or implied, or by operation of law or statute. *Cerreta v. Kinney Corp.*, 50 N.J. Super. 514, 517, 142 A.2d 917 (App. Div.1958). A bailment arises when a person leaves his chattel on the premises of another "if the latter is given primary control of the chattel for the time being." *Moore's Trucking Co. v. Gulf Tire & Supply Co.*, 18 N.J. Super. 467, 469–70, 87 A.2d 441 (N.J. Super. Ct. App. Div.) (listing as examples of bailments: "jewelry checked with a swimming pool attendant; diamonds delivered to a retail jeweler 'on memorandum' for sale; automobile placed in shop to be washed; airplane stored in a hangar," (citations omitted)), *certif. denied*, 10 N.J. 22, 89 A.2d 306 (1952). A bailment has been explained in the following way:

> A bailment is created by the delivery of personal property by one person to another in trust for a specific purpose, pursuant to an express or implied contract to fulfill that trust. Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor.

8A Am.Jur.2d Bailments § 1 (1997). Notably, for a bailment to arise, the bailor must have "possession and primary control" over the chattel. *City of Jersey City v. Liggett & Myers Tobacco Co.*, 14 N.J. 112, 115, 101 A.2d 555 (1953).

Where, as here, a third party has come into possession of the property,

> [i]t has been said that a constructive bailment or a bailment by operation of law may be created when a person comes into possession of personal property of another, receives nothing from the owner of the property, and

---

A. Yes, it does. It depends on the size of the boat.

Q. What is the range of fees?

A. Depends on the space that boat takes. It's just calculated based on the size.

Q. Who provides the quotes to customers?

A. Aleksandr Solovyev.

Q. Not you?

A. No.

(Bakhirev Tr. I at 137-39)

has no right to recover from the owner for what he does in caring for the property. Such person is ordinarily considered to be a gratuitous bailee, liable only to the bailor for bad faith or gross negligence. 8 Am.Jur.2d, Bailment, s 14 at 918 (1963); *Weinstein v. Sheer*, 98 N.J.L. 511, 514, 120 A. 679 (E. & A. 1922); *Dudley v. Camden and Phila. Ferry Co.*, 42 N.J.L. 25, 27 (Sup.Ct. 1880). *And see, Zuppa v. Hertz Corp.*, 111 N.J. Super. 419, 268 A.2d 364 (Cty.Ct. 1970) in which it is stated:

> * * * It is the element of lawful possession, however created, and the duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based upon contract in the ordinary sense or not. Laidlaw, "Principles of Bailments," 16 Cornell L.Q. 286 (1931). (at 423, 268 A.2d at 366)

> Where possession has been acquired accidentally, fortuitously, through mistake or by an agreement for some other purpose since terminated, the possessor, "upon principles of justice," should keep it safely and restore or deliver it to its owner. Under such circumstances, the courts have considered the possessions quasi-contracts of bailment or constructive and involuntary bailments. *State v. Carr*, 118 N.J.L. 233, 234, 192 A. 36 (E. & A. 1937).

*Capezzaro v. Winfrey*, 153 N.J. Super. 267, 270–71, 379 A.2d 493, 495 (App. Div. 1977).

Here, Defendants do not dispute that "[Marine Transport] uses World Express as its CFS/CY," *i.e.,* its container freight station/container yard. (DSOF ¶ 15) When the Formula boat arrived, it was placed in World Express's warehouse. "[A] bailment may be spelled out of circumstances which surround a situation where one lawfully obtains possession of personal property of another and is bound to account for such property." *Carr*, 117 N.J.L. at 251. Thus, World Express when it lawfully came into possession of the Formula became the Formula's bailee.

What remains disputed is whether World Express was entitled to a fee for its services as bailee, and the amount of any such fees. "The Court recognizes a bailee does have the right to recoup unpaid storage fees." *Weissman v. Williams*, No. 1:15-CV-40(WLS), 2017 WL 11404587, at *17 (M.D. Ga. Sept. 29, 2017). There is some evidence of what Plaintiff expected to be paid for storage

of the Formula in the form of invoices it sent to Marine Transport. (*See, e.g.*, DE 191-12). World Express and Marine Transport seem to have agreed between themselves that the rate would be $105.31 per day to store the Formula boat. Indeed, Marine Transport *paid* World Express nearly $34,000 for the storage of that boat. (DE 188-4 at 159; DE 191-12) The continuing mystery is why World Express, which has been paid by Marine Transport, believes it should recover the $34,000 from Defendants. It seems that if anybody is out $34,000, it is Marine Transport.

Almost as mystifying is Defendants' position that they never agreed to pay anything for storage of the Formula. Defendants proffer a number of theories for why they owed nothing for storage. (*See* DE 192 generally.) Those theories are as follows: One, Defendants point to an absence of any evidence—communications between Safonov and Solovyev, receipts, bills of lading, etc.—which would support charging $105.31 per day. Two, Plaintiff knew there would be no charge for the storage for the Formula because Defendants were simultaneously shipping the Mercedes and Porsche to Dubai to repair and sell, in effect providing an offset against the storage charges. Three, the Formula had to be stored only because Marine Transport failed to fulfill its promise of expeditiously finding a suitable trailer in connection with the plans for export.

Material facts remain in dispute. I will therefore deny both motions for summary judgment on Count 1 insofar as it asserts a theory of common law bailment.

### iii.  Quantum Meruit

Only Defendants discuss a quantum meruit theory, and that only in the most cursory manner. (DE 192 at 29) Once again, their position is they never engaged the services of World Express and World Express never stored anything. (*Id.*) As discussed above, World Express argues that it was the CFS/CY for Marine Transport; when Marine Transport stored a vehicle, it did so through World Express. I will deny Defendants' motion for summary judgment.

"'Quantum meruit,' which literally means 'as much as is deserved,' is applied when, absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (N.J. Super. Ct. App. Div. 2007) (citations omitted). To recover under a theory of quantum meruit, a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of the services by the entity to which they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Coldwell Banker Commercial/Feist & Feist Realty Corp. v. Blancke P.W. L.L.C.*, 368 N.J. Super. 382, 401 (N.J. Super. Ct. App. Div. 2004) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)).

Here, World Express has introduced evidence that it did, in fact, store the Formula on behalf of Marine Transport and Defendants, satisfying element 1. However, as noted above, there are material fact issues that preclude summary judgment as to elements two, three, and four. Defendants, for example, were well aware that World Express was Marine Transport's CFS/CY. (DSOF ¶ 15) They also understood that there could be *some* storage fees for the Formula, at least insofar as the boat was being stored while awaiting export. (*Id.* ¶ 76) However, there is also evidence upon which a reasonable jury could find that Plaintiff was not entitled to storage fees. For example, Mr. Safonov testified that Plaintiff understood that it would not be paid storage fees because the boats would be stored for free in exchange for Mr. Safonov's shipping, storing, and repairing the at-issue Mercedes and Porsche vehicles in Dubai. (DE 187-6 ("Safonov Tr.") pp. 70-73) Some corroboration of this offset theory is available in the form of evidence that Defendants allegedly incurred $50,000 in fees for those vehicles without expectation of reimbursement them for those fees. Still, there seems to be no contemporaneous documentation of any such quid pro quo.

31

Accordingly, Defendants'/Third-Party Plaintiffs' motion for summary judgment on Count 1 is denied.

### iv.  Piercing the Corporate Veil

Count 2 seeks to pierce the corporate veil to hold Mr. Safonov personally liable. Veil piercing is an equitable remedy whereby "the protections of corporate formation are lost" and the parent corporation may be found liable for the actions of the subsidiary. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F.Supp.2d 482, 497 (D.N.J. 2002). In that regard, "piercing the corporate veil is not technically a mechanism for imposing 'legal' liability, but for remedying the 'fundamental unfairness [that] will result from a failure to disregard the corporate form.'" *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 193 (3d Cir. 2003).

New Jersey law assumes that a corporation is a separate entity from its shareholders, *Lyon v. Barrett*, 89 N.J. 294, 300 (1982), "and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State Dept. Of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500 (1983). Thus, in the absence of extraordinary circumstances, such as fraud or injustice, a court will generally decline to pierce the corporate veil. *Id.* "[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity." *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super. 232, 240 (App. Div. 1996).

In New Jersey, two elements must be shown to pierce the corporate veil: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *The Mall at IV Group Properties, LLC v. Roberts*, No. 02–4692, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005) (citation omitted). However, even in instances where one individual

shareholder or director dominates the corporate entity, "liability generally is imposed only where the [dominant party] has abused the privilege of incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 94 N.J. at 500, 468 A.2d 150. In determining whether a unity of interest and ownership exists under the first prong, the Third Circuit has applied six non-binding factors to guide this inquiry:

> [1] gross undercapitalization ... [2] "failure to observe corporate formalities, non-payment of dividends, [3] the insolvency of the debtor corporation at the time, [4] siphoning of funds of the corporation by the dominant stockholder, [5] non-functioning of other officers or directors, absence of corporate records, and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

*Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir.1988) (citations omitted). With respect to the second element, a plaintiff need not prove common law fraud but instead demonstrate that the defendants, via the corporate form, perpetrated "a fraud, injustice, or the like," a less exacting standard. *Group Properties*, 2005 WL 3338369, at *3.

The issue of piercing the corporate veil is submitted to the factfinder, unless there is no sufficient evidence to justify disregard of the corporate form. *G–I Holdings, Inc. v. Bennett*, 380 F.Supp.2d 469, 477–78 (D.N.J. 2005). *See Morris v. Krauszer's Food Stores, Inc.*, 300 N.J. Super. 529, 542, 693 A.2d 510 (N.J. Super. Ct. App. Div.) (finding error in charge on alter ego doctrine harmless because no evidence to justify disregard of corporate form), *certif. denied*, 151 N.J. 77, 697 A.2d 549 (1997). "[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity." *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super. 232, 240, 670 A.2d 1092 (N.J. Super. Ct. App. Div. 1996).

Here Defendants state that Plaintiff has failed to produce any evidence during discovery to support piercing the corporate veil of the Defendant

entities. (DE 192 at 29) Plaintiff's evidence for veil-piercing is that Mr. Safonov stated in his deposition that Middle East FZE did not pay taxes in the United Arab Emirates. (DE 194 at 13) In the same sentence, Plaintiff concedes that the United Arab Emirates does not have a federal corporate tax structure. (*Id.*)

As to the *Craig* factors, there has been no evidence presented that any of the Defendant entities, Crocus LLC, Crocus FZE, or Middle East FZE, are grossly undercapitalized or that they have failed to observe corporate formalities. Plaintiff submits at least one set of minutes kept by Middle East FZE. (DE 194 at 12 (citing Ex. 21, board minutes for Middle East FZE)) Nor has World Express pointed to the insolvency of any of these entities or the illicit siphoning of funds as the basis for ignoring corporate forms here.

Accordingly, Count 2 is dismissed.

### B. Third-Party Complaint/Counterclaim

I turn to the cross-motions for summary judgment on the Third-Party Complaint and Counterclaim, which relate to the Porsche and Mercedes. Those claims are (1) fraud, (2) civil conspiracy, (3) breach of contract, (4) unjust enrichment, (5) quantum meruit, and (6) account stated.

#### i. Standing

I start with the threshold issue of standing. Plaintiff/Third-Party Defendants argue in their opening brief that "[t]he subject vehicles were sent to Mr. Safonov in Dubai by MTL." (DE 187-2 at 8) For the first time, in their reply brief, they contend that Safonov has no standing to counter-sue with respect to the Porsche and Mercedes because he is not affiliated with Middle East Asia Alfa *FZC* (as distinguished from Middle East Asia Alfa FZE or LLC), the entity which, they say, received the vehicles and paid for the costs/fees. (DE 194 at 12) I will not entertain a complex standing argument thrown into a reply brief with no opportunity to respond. Perhaps these matters will be explored in some other motion or at trial, but for now I do not resolve them.[8]

---

[8]     I would not necessarily forgo a decision if I could discern the evidentiary basis for Plaintiff's argument. Little effort is made to explain the relationships among FZC,

### ii.  Count 1: Fraud

Plaintiff/Third-Party Defendants move for summary judgment, asserting that Counterclaimants/Third-Party Plaintiffs have failed to prove their fraud claim with respect to the Mercedes and Porsche. Their primary contention is that Mr. Safonov doesn't remember the transaction. (DE 187-2 at 5-6; DE 194 at 6) Defendants respond that Third-Party Defendants fraudulently induced them to agree to incur expenses to ship and repair the Porsche and Mercedes by claiming that these vehicles were purchased at auction. (DE 192 at 38-39) However, says Defendants, these cars legally belonged to others, not parties to this lawsuit, and were not the property of Third-Party Defendants at all. (*Id.*)

"Although the word 'fraud' is used in common parlance to connote any practice involving shady or underhanded dealing, in the law it is a term of art with a clear definition." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 175, 876 A.2d 253 (2005). To establish fraud under New Jersey law, a plaintiff must prove that "the defendant made (1) a material misrepresentation of present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) and which resulted in reasonable reliance by plaintiff." *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir. 1993); *see Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997).

In addition, "allegations of fraud must be proved by clear and convincing evidence." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1988) (citing *Vanguard Telecomm., Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1187 (D.N.J. 1989), *aff'd*, 900 F.2d 645 (3d Cir. 1990); *Fox v. Mercedes-Benz Credit Corp.*, 281 N.J. Super. 476, 484, 658 A.2d 732 (App. Div. 1995)). Therefore, to survive summary judgment, "a plaintiff must meet his or her

---

FZE and LLC. The entity that is a party to this lawsuit, recall, is Middle East Asia Alfa FZE. Plaintiff/Third-Party Defendants cite to "Ex. 20," a bill of lading listing Tretiykov and "Middle East Asia Alfa FZC" as the exporter. They also cite "Ex. 21," a May 2007 set of board minutes from "Middle East Asia Alfa LTD." Plaintiff concedes that Safonov "is the sole owner and decision maker of . . . Middle East Asia Alfa FZE." (PSOF ¶ 3) Plaintiff also states that Middle East Asia Alfa FZC is Mr. Safonov's company. (PRSOF ¶ 69) All of this says very little about the issue that Plaintiff seeks to raise or the relevant time period, 2013–14.

'burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud.'" *Id.* (quoting *Moffatt Enterprises, Inc. v. Borden Inc.*, 807 F.2d 1169, 1174-75 (3d Cir. 1986)).

Of the four elements of fraud, "[m]isrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular N. Am.*, 184 N.J. at 175, 876 A.2d 253. An alleged misrepresentation must be premised upon an assertion that is not in accord with the facts. Restatement (Second) of Contracts § 159 cmt. a, c (1981). However, the assertion "must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events." *Id.* "Indeed, in order to constitute a fact, a statement's content must be susceptible of 'exact knowledge' at the time it is made." *Alexander*, 991 F. Supp. at 435.

Neither side has met its burden to demonstrate an absence of a genuine, material issue of fact as to element (1), a material misrepresentation of present or past fact concerning how the vehicles were acquired and who was their proper owner.

Plaintiff/Third-Party Defendants assert that the subject vehicles were legitimately acquired by Marine Transport at auction. They point to their "Ex. 10" (DE 187-13), which consists of bills of lading and salvage certificates for the cars. (PSOF ¶ 15) These documents list several entities, including IAM & AL Group and IAA. No receipts are provided from the purported IAA auction.

Defendants, on the other hand, provide documents that could persuade a reasonable juror to reject Plaintiff's version of events. Defendants say that Solovyev and Alper provided them with documents that show that Car Express purchased the Porsche on May 28, 2013 and the Mercedes on June 7, 2013 through Copart auctions. (DSOF ¶¶ 61, 71 (citing "Exhibit DD" (DE 190-4) Copart invoices for the two vehicles)) Defendants also submit answers to interrogatories propounded by plaintiffs in the EDNY Action, attested to by Alla Solovyeva, which state that the Mercedes and Porsche were exported to Dubai

"pursuant to Clause 15 of the MTL House Bill of Lading ['LIEN'] for unpaid freight and other charges owed." (DE 189-26 ("Exhibit W") at 3)

It is thus apparent that there is a genuine issue of fact for trial as to whether there was a misrepresentation here and, if so, by whom. *Anderson,* 477 U.S. at 248, 249. Both sides' motions for summary judgment on Count 1 are denied.

### iii.  Count 2: Civil Conspiracy

In New Jersey, the essential elements of a civil conspiracy are: (1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages. *Board of Ed. of the City of Asbury Park v. Hoek,* 66 N.J. Super. 231, 241, 168 A.2d 829 (N.J. Super. Ct. App. Div. 1961), *rev'd in part on other grounds,* 38 N.J. 213, 183 A.2d 633(1962). However, a plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the "exact limits of the illegal plan or the identity of all participants," as long as plaintiff alleges that each participant shared in "the general conspiratorial objective." *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J. Super. 337, 365, 633 A.2d 985 (N.J. Super. Ct. App. Div. 1993).

A civil action for conspiracy is essentially a tort action. Therefore, to maintain an action for civil conspiracy, a plaintiff must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause. *Hoek,* 66 N.J. Super. at 241, 168 A.2d 829. "[T]he conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors." *Hoek*, 66 N.J. Super. at 241, 168 A.2d 829. The actionable element is the tort which the defendants agreed to perpetrate and which they actually committed. *Landriani v. Lake Mohawk Country Club,* 26 N.J. Super. 157, 159, 97 A.2d 511 (N.J. Super. Ct. App. Div. 1953).

The threshold problem is the lack of proof of an underlying tort. As noted above, I must deny summary judgment as to the fraud claim. So at the very least, summary judgment must be denied as to civil conspiracy.

Plaintiff contends further that Count 2 must be dismissed based on the intracorporate conspiracy doctrine. There can be no conspiracy here, they say, because Solovyev, Solovyeva, Alper, and Bakhirev all acted as employees and officers of the same entity, Marine Transport. (DE 187-2 at 9)

The intracorporate conspiracy doctrine bars allegations of conspiracy because employees generally cannot conspire with their organization. *Heffernan v. Hunter*, 189 F.3d 405, 412 n.5 (3d Cir. 1999); *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 246-47 (E.D.N.Y. 2009) (stating that the intracorporate conspiracy doctrine provides that "a corporation or public entity generally cannot conspire with its employees or agents as all are considered a single entity.") (internal quotation marks and citation omitted). In a related vein, individual agents , officers, or employees of a corporation, acting in their representative capacities cannot conspire among themselves. *Marjac, LLC v. Trenk*, No. CIV A 06-1440 JAG, 2006 WL 3751395, at *16 (D.N.J. Dec. 19, 2006) (citations omitted). Nevertheless, a conspiracy is possible between a agents, officers, or employees of a corporation where they were acting as *individuals*, rather than representatives of the corporation. *Id.*

Here I will deny both motions for summary judgment as to Count 2 for civil conspiracy. It is uncontested that Solovyev, Solovyeva, Alper, and Bakhirev are all employees and agents of Marine Transport.[9] During this time period, Bakhirev was the general manager of Marine Transport. (DSOF ¶¶ 25-28) Alper was general counsel and director of operations for Marine Transport. (*Id.* ¶¶ 42–44; *see also* DE 189-22) Ms. Solovyeva owns Marine Transport. (*Id.* ¶¶ 45-47; PRSOF ¶¶ 45-47) Mr. Solovyev held himself out as an agent of Marine Transport and not even Defendants contest that Solovyev was a part owner, at least as of 2015. (DSOF ¶¶ 45–47 (citing exhibits located at DE 189-22

---

[9]    I separately address the claims against Mr. Chernin. *See* Section III.B.vii.

(Certification of Vadim "Dimitry" Alper) to DE 189-24 (Union County Prosecutor's Office Report on Marine Transport))) However, the record is at best muddled as to each individual's role in the conspiracy and whether each individual was acting on behalf of him or herself for personal gain, as agents of some other entity, or as agents of a single corporation, Marine Transport.

### iv.  Count 3: Breach of Contract

Defendants/Third-Party Plaintiffs contend that the parties had an agreement with respect to the Mercedes and Porsche:  Solovyev and Alper, they say, agreed to ship the vehicles to Dubai and in exchange Defendants/Third-Party Plaintiffs would pay all customs, fees, and repair costs associated with the vehicles. Confusingly, they also contend that Solovyev and Alper agreed to repay those costs. The only supporting evidence is Mr. Safonov's own certification and the invoice they sent in August 2014 to Royal Finance for $50,000 after receiving and repairing the vehicles in Dubai. (DSOF ¶ 68; DE 192 at 42-43)

But Defendants/Third-Party Plaintiffs point to no evidence suggesting that there was a meeting of the minds prior to the acquisition, shipment, and repair of the vehicles over who would pay for what services and expenses. *See In re Rappaport*, 517 B.R. at 529. The only evidence in the record regarding the vehicles are bills of lading, salvage certificates, and Middle East FZE's invoice. (DE 187-13; DE 189-28) No communications are in evidence attesting to the parties' understanding about these vehicles. No written agreement is provided. There is simply no evidence of a bilateral understanding that Third-Party Defendants would be reimbursed for 100% of the cost to ship and repair the vehicles.

The reality seems to have been a loose and undefined relationship whereby Third-Party Defendants would pay for the vehicles upfront while Third-Party Defendants would then pay to ship the vehicles and repair them in Dubai. There is no evidence that the parties ever discussed reimbursing Third-Party Plaintiffs for the $50,000 in costs they incurred to ship and repair the

vehicles. Indeed, Defendants/Third-Party Plaintiffs admit that it was agreed that they would incur these costs so that the cars could ultimately be sold in Dubai, with the parties splitting the profits. (DE 192 at 12) The real problem seems to be that the profits never appeared.

No party suggests that there was an oral agreement, but such a contention would not alter the picture. An oral agreement must still satisfy the basic elements of any contract: 1) mutual assent or "meeting of the minds," 2) consideration from both parties, and 3) terms that are "sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Shogen v. Global Aggressive Growth Fund, Ltd.*, 2007 WL 1237829, at *14 (D.N.J. Aug. 3, 2007) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992)). There is no evidence of any agreement, oral or written, that was definite enough to impose liability for costs on Third-Party Defendants or Plaintiff.

Accordingly, I will grant Plaintiff's/Third-Party Defendants' motion for summary judgment and dismiss Count 3, the contract claim, of the Third-Party Complaint and Counterclaim. I will deny Defendants'/Third-Party Plaintiffs' cross-motion for summary judgment on Count 3.

### v. Counts 4 and 5: Unjust Enrichment / Quantum Meruit

As noted, *supra* (Section III.A.iii), recovery under a theory of quantum meruit requires that a plaintiff prove (1) the performance of services in good faith; (2) the acceptance of the services by the entity to which they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Blancke P.W. L.L.C.*, 368 N.J. Super. at 401.

To prove a claim for unjust enrichment, "a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'" *Thieme v. Aucoin–Thieme*, 227 N.J. 269, 151 A.3d 545, 557 (2016) (quoting *Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 110, 922 A.2d 710 (2007). This doctrine of quasi-contract also requires that plaintiff show that it expected remuneration from the defendant at the time it performed

or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond what would have been its contractual rights. *Id.* (quoting *Iliadis*, 191 N.J. at 110, 922 A.2d 710). *See also Ebner v. Statebridge Co., LLC*, No. 16-8855, 2017 WL 2495408, at *9 (D.N.J. June 9, 2017) (noting that restitution for unjust enrichment is an equitable remedy and only available when there is no express contract providing for remuneration).

Under Counts 4 and 5, Defendants/Third-Party Plaintiffs seek to recover the "fair and reasonable value of the materials and services furnished. . . which has not been paid is $50,000." (DE 51 ¶¶ 264, 270). They paint a picture of a negotiated arrangement regarding the Porsche and Mercedes:

> It was agreed that Third-Party plaintiffs would undertake to receive, unload and repair the cars, pay all requisite customs duties and other expenses, transfer the U.S. Certificate of Title (which indicated ownership by MAVL Capital Inc. and Maxim Ostrovskiy) to a United Arab Emirates title (See, Plaintiff's/Third-Party Defendants' Ex. 3 at pp. 70-73. *See, also,* ¶ 69) and ultimately sell the cars in Dubai, at which time Solovyev, MTL and Third-Party plaintiffs would split the profit.

(DE 192 at 12). For these purposes, Defendants/Third-Party Plaintiffs concede (*arguendo,* at least) that there was never any true agreement to reimburse them for their efforts to export and repair the vehicles. The cost of repairs was not a benefit conferred upon Third Party Defendants for which they ought in equity to be reimbursed; it was in effect an investment that did not pan out. I cannot find a legitimate, enforceable expectation of reimbursement.

Plaintiff's/Third-Party Defendants' motion for summary judgment on Counts 4 and 5 is granted. Defendants'/Third-Party Plaintiffs' motion for summary judgment on Counts 4 and 5 is denied.

### vi.  Count 6: Account Stated

"To establish an account stated, respondent must show that a balance was struck in such circumstances as to import a promise of payment on the one side and acceptance on the other." *United States v. A. S. Kreider Co.*, 313

U.S. 443, 448 (1941). "It is not essential that an account stated be in any particular form. Any evidence indicating an admission by the debtor to the creditor of a stated indebtedness claimed by the latter will furnish ground for implying a promise to pay. Evidence of assent to an account stated may consist of express statements or inferences from conduct." *Harris v. Merlino*, 137 N.J.L. 717, 720, 61 A.2d 276, 279 (1948) (citing 6 Williston on Contracts, sec. 1863).

The Third-Party Complaint states that an account totaling $50,000.00 was delivered to and accepted by Solovyev and a balance of $50,000 remains due and owed. (DE 51-2 at 27) Defendants state that "Alexander Solovyev and MTL promised to repay" this invoice. (DSOF ¶ 68) It is undisputed that an invoice was sent on August 20, 2014 to Royal Finance that outlined that the customs, fees, repair and storage for the Porsche was $44,000 and billed Royal Finance for the Mercedes in the amount of $6,000. (DE 190-5 at 18-19) However, there is no evidence in the record indicating that Third-Party Defendants actually accepted this invoice and agreed to pay these fees. (PRSOF ¶ 67) As noted, *supra*, *see* Section III.B.v, Defendants concede that this was not a case of hiring someone to repair a car and receiving a bill for services in return; rather, this was part of a speculative attempt to reap a large profit when the vehicles were sold. (DE 192 at 12).

Accordingly, I deny Defendants'/Third-Party Plaintiffs' motion for summary judgment as it pertains to Count 6. I will grant Plaintiff's/Third-Party Defendants' motion for summary judgment as to Count 6.

### vii.  Claims asserted against Chernin

Defendants continue to pursue their claims against Mr. Chernin, the owner of World Express in 2016. Defendants assert that he should be liable for fraud, civil conspiracy, breach of contract, quasi contract, and account stated claims. (DE 192 at 41) The theory is that Chernin "sat on his hands and allowed this frivolous lawsuit to continue" during his tenure from March to December 2016 and purportedly perjured himself in his deposition.

These threadbare assertions fail to establish any actual wrongdoing on the part of Mr. Chernin that contributed to Third-Party Plaintiffs' purported harm in 2014. There is no evidence that Mr. Chernin was involved in any of the events concerning the three boats or the two vehicles.

Accordingly, Defendants/Third-Party Plaintiffs' motion for summary judgment as to Mr. Chernin is denied. Plaintiff's motion for summary judgment as it pertains to Mr. Chernin is granted. All claims against Mr. Chernin are dismissed.

### viii.  Piercing the corporate veil of Third-Party Defendants

In their prayer for relief, Third-Party Plaintiffs seek to pierce to corporate veil of Third-Party Defendants to hold Solovyev, Solovyeva, Bakhirev, and Chernin personally liable. The entirety of Plaintiff's/Third-Party Defendants' argument is this: "Similarly, there is absolutely no evidence to pierce the corporate veil. The corporate veil will be pierced if there is evidence that the corporate form is being used to cause injustice. (*See State Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500 (1983))." Plaintiff/Third-Party Defendants point to no evidence establishing why they are entitled to summary judgment. Accordingly, I find that as the moving party they have not discharged their burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Accordingly, Plaintiff's/Third-Party Defendants' motion for summary judgment insofar as it seeks to dismiss the veil-piercing component of Third-Party Plaintiff's prayer for relief is denied.

## IV.   Sanctions Motion

I briefly address Defendants' motion for sanctions. (DE 188) "Generally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (citation and internal quotation marks omitted).

Defendants contend that World Express's complaint is frivolous because World Express is a sham company and this litigation was only brought to force Defendants to incur legal fees to defend against it. (DE 188-1 at 24) Thus, says Defendants, the filing of the complaint violates Rule 11.

I will exercise my discretion to deny the motion for sanctions. *Derechin v. State Univ. of N.Y.*, 963 F.2d 513, 516 (2d Cir. 1992); *see also Brubaker Kitchens, Inc. v. Brown*, 280 F. App'x 174, 185 (3d Cir. 2008) ("It is well-settled that the test for determining whether Rule 11 sanctions should be imposed is one of reasonableness under the circumstances, the determination of which falls within the sound discretion of the District Court.").

Rule 11(b), Fed. R. Civ. P., provides, *inter alia*, that by submitting a pleading, such as a Complaint, "an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."[10] *See also Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers*, 855 F.2d 1080, 1090 (3d Cir. 1988).

---

[10]     Rule 11, in its entirety, reads as follows:

Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

(a) Signature. Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

Defendants' motion reiterates all of the arguments asserted in its motion for summary judgment and, essentially, claims that because discovery has, in its opinion, proven that the claims in the complaint cannot be true, they should be awarded damages. Rule 11 draws "a line between zealous advocacy

---

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions.

(1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) Motion for Sanctions. A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) On the Court's Initiative. On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) Limitations on Monetary Sanctions. The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) Requirements for an Order. An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

and frivolous conduct." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1343 (2d Cir. 1991). It "is not an appropriate vehicle for resolving legal or factual disputes," or "address[ing the strength or merits of a claim." *StrikeForce Techs., Inc. v. WhiteSky, Inc.*, 2013 WL 5574643, at *4 (D.N.J. Oct. 9, 2013). "Thus, the mere failure of a complaint to withstand a motion for summary judgment or a motion to dismiss should not be thought to establish a rule violation." *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994) (internal citation and quotation marks omitted).

But, this litigation, and related actions filed before the Commission and in the EDNY have been extremely contentious and litigated for nearly seven years. The parties have presented numerous factual issues that have required extensive discovery to resolve, and in many cases, remain disputed, including Plaintiff's claims here.

In any event, Defendants' sanctions motion turns on the identity of World Express and whether it is, in fact, a storage company or a sham entity. Defendants argue that the owner of World Express, Ms. Bakhirev, testified that World Express does not have a storage facility nor a warehouse, but provides no citation to such testimony. (*See* DE 188-1 at 24) Defendants then focus on Ms. Bakhirev's testimony (again without any citations) that Ms. Bakhirev did not know Mr. Safonov, and that World Express never stored anything so there was no basis for this lawsuit. (*Id.*) But Defendants acknowledge that World Express was no stranger; through Marine Transports' listed tariffs they knew World Express was the Container Freight Station/Container Yard for Marine Transport. (DSOF ¶ 15) And there is no evidence that World Express is a fictitious or sham entity. *See* Section III.A.iv, *supra.*

Accordingly, Defendants'/Third-Party Plaintiffs' motion for sanctions is denied.

**V.    Conclusion**

For the reasons set forth above, I will **grant in part and deny in part** Plaintiff's motion for summary judgment (DE 187) on the Third-Party Complaint. I will also **grant in part and deny in part** Defendants' cross-motion for summary judgment. (DE 189)

The following claims are dismissed with prejudice from the Complaint (DE 1):

**Count 1** is insofar as it seeks recovery for $5,500 in fees associated with the Chaparral and Monterey boats and insofar as it asserts a breach of contract claim.

**Count 2** is dismissed in its entirety with prejudice.

The only claims that remain in the Complaint under **Count 1** are Plaintiff's claims for unpaid storage fees under a bailment or quantum meruit theory of liability.

The following claims are dismissed with prejudice from the Third Party Complaint (DE 51):

All claims against Mr. Chernin are dismissed with prejudice.

**Count 3** (Breach of Contract), **Count 4** (Unjust Enrichment), **Count 5** (Quantum Meruit), and **Count 6** (Account Stated) against all Third-Party Defendants.

The only claims that remain are **Count 1** (Fraud) and **Count 2** (Civil Conspiracy) asserted against World Express, Marine Transport, Royal Finance, Car Express, Mr. Alper, Mr. Solovyev, Ms. Solovyeva, and Ms. Bakhirev.

Plaintiff's/Third-Party Defendants' motion for summary judgment on Third-Party Plaintiffs' prayer for relief to pierce the corporate veil is **denied**.

Finally, Defendants' motion for sanctions (DE 188) is **denied**.

Dated: August 28, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**