# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------

**WORLD EXPRESS & CONNECTION, INC.,**

   **Plaintiff,**

  v.

**CROCUS INVESTMENTS, LLC, et al.; CROCUS FZE; ALEXANDER SAFONOV; and MIDDLE EAST ASIA ALFA FZE,**

  **Defendants.**

---------------------------------------------

**CROCUS INVESTMENTS, LLC, CROCUS FZE, ALEXANDER SAFONOV, and MIDDLE EAST ASIA ALFA FZE,**

   **Third-Party Plaintiffs,**

  v.

**MARINE TRANSPORT LOGISTIC, INC. ROYAL FINANCE GROUP, INC., CAR EXPRESS & IMPORT, INC. ALEKSANDR SOLOVYEV, VADIM ALPER a/k/a DIMITRY ALPER, ALLA SOLOVYEVA, RAYA BAKHIREV, and ROMAN CHERNIN,**

  **Third-Party Defendants.**

---------------------------------------------

**Civil Action No. 15-8126 (MAH)**


**OPINION**


**HAMMER, United States Magistrate Judge**

## I.  INTRODUCTION

  This matter concerns a dispute relating to the shipping, export, repair, and resale of three boats and two cars.   The Court conducted a bench trial on March 17, 18, and 19, 2025.   For the reasons discussed below, the Court finds that Plaintiff and Defendants have failed to carry their

respective burdens.   Accordingly, the Court declines to enter judgment in favor of either party.

## II.    BACKGROUND AND PROCEDURAL HISTORY

On November 18, 2015, Plaintiff World Express & Connection, Inc. ("World Express" or "Plaintiff") filed a Complaint seeking storage and other related charges for three boats owned by Defendants Crocus Investments, LLC ("Crocus LLC"), Crocus FZE (together with Crocus LLC, the "Crocus Entities"), Alexander Safonov ("Safonov"), and Middle East Asia Alfa FZE ("Middle East FZE" and collectively with the Crocus Entities and Safonov, "Defendants"). Compl., D.E. 1.   On September 21, 2016, Defendants filed a Third-Party Complaint and Counterclaim seeking damages associated with the three boats as well as the purchase, storage, shipping, and repair of two cars against Marine Transport Logistic, Inc. ("Marine Transport"), Royal Finance Group, Inc. ("Royal Finance"), Car Express & Import, Inc. ("Car Express"), Aleksandr Solovyev ("Solovyev"), Alla Solovyeva ("Solovyeva"), Raya Bakhirev ("Bakhirev") (collectively, "Third-Party Defendants"), Vadim Alper ("Alper"), and Roman Chernin ("Chernin").   Third-Party Compl., D.E. 17.   Specifically, Defendants claimed fraud, civil conspiracy, breach of contract, unjust enrichment, quantum meruit, and account stated, against the Third-Party Defendants.   *Id.*   Defendants alleged fraud against Plaintiff World Express as a counterclaim.   *Id.*

On June 21, 2017, Defendants filed a motion to amend their counterclaims, to add additional factual allegations in support of their fraud claim and to assert a claim under the New Jersey Consumer Fraud Act ("NJCFA").   Mot. for Leave to File Am. Third-Party Compl., D.E. 51.   On October 10, 2017, this Court granted Defendants' request to add additional factual allegations, but denied Defendants' request to assert a new claim under the NJCFA.   Op., D.E. 74; Order, D.E. 75.

The parties cross-moved for summary judgment on December 21 and 23, 2019, respectively.   D.E. 187, D.E. 189.   The Honorable Kevin McNulty granted in part and denied in part the parties' respective motions.   Op., Aug. 28, 2020, D.E. 202; Order, Aug. 28, 2020, D.E. 203.   Accordingly, the remaining claims are as follows: (1) Plaintiff's claims for unpaid storage fees under a bailment or quantum meruit theory of liability against Defendants; and (2) Defendants' fraud and civil conspiracy counterclaims and third-party against World Express, Marine Transport, Royal Finance, Car Express, Alper,[1] Solovyev, Solovyeva, and Bakhirev. Order, Aug. 28, 2020, D.E. 203.

## III.   FINDINGS OF FACT[2]

The Court derives its findings of fact from the parties' stipulated facts, the exhibits and

---

[1]   There are no longer claims pending against Vadim Alper and Roman Chernin.   *See* Final Pretrial Order, Jan. 6, 2025, D.E. 277, at 2 n.1; Order, Aug. 28, 2020, D.E. 203.

[2]   For clarity, certain citations to the trial record are abbreviated as follows:

The parties Stipulation of Facts contained in the January 6, 2025 Final Pretrial Order, D.E. 277, is referred to as SOF.

The March 17, 2025 Trial Transcript, D.E. 295, is referred to as 3/17/25 Tr.

The March 18, 2025 Trial Transcript, D.E. 296, is referred to as 3/18/25 Tr.

The March 19, 2025 Trial Transcript, D.E. 297, is referred to as 3/19/25 Tr.

Plaintiff and Third-Party Defendants' May 5, 2025 Trial Brief, D.E. 298, is referred to as Pl.'s Tr. Br., D.E. 298.

Defendants' May 27, 2025 Refiled Trial Brief, D.E. 305, is referred to as Defs.' Tr. Br., D.E. 305.

Plaintiff and Third-Party Defendants' May 28, 2025 Trial Brief in Response to Defendants' Trial Brief, D.E. 308, is referred to as Pl.'s Resp. Br., D.E. 308.

Defendants' May 27, 2025 Trial Brief in Response to Plaintiff and Third-Party Defendants' Trial

deposition designations admitted at trial or separately stipulated by the parties,[3] and the trial testimony of Alexander Safonov, Raya Bakhirev, Aleksandr Solovyev, and Alla Solovyeva, and Pavel Pinchuk ("Pinchuk").[4]   The Court has also considered the parties' post-trial briefs, which were filed in May 2025.   *See* D.E. 298, 303, 305, 308.

### A.    The Parties

#### 1.   The Crocus Parties

Defendant/Third-Party Plaintiff Alexander Safonov is the sole owner of the Crocus Entities and owns fifty percent of Middle East FZE.   SOF, ¶ 3; 3/17/25 Tr. at 62:6-11.   However, he retains the voting rights for Middle East FZE.   3/17/25 Tr. at 62:6-11.   The Crocus Entities and Middle East FZE are primarily involved in the repair, transportation, and sale of boats.   3/17/25 Tr. at 62:12-17.   The three entities are the entities Safonov used to acquire the boats and cars at issue.   *See* 3/17/25 Tr. at 62:24-63:3; *see also* SOF, ¶¶ 25-26, 28-29, 37-38.

---

Brief, D.E. 303, is referred to as Defs.' Resp. Br., D.E. 303.

[3]   For reference, an Appendix is attached to this Opinion outlining the exhibits admitted at trial and the deposition designations the parties' stipulated to.

[4]   Pavel Pinchuk testified as an expert on behalf of Defendants.   *See* 3/19/25 Tr.   Defendants offered Mr. Pinchuk as an expert in the requirements that boat trailers have Vehicle Identification Numbers ("VIN") and the process for procuring VINs for boat trailers, as well as Defendants' damages calculations as to the boats.   *Id.* at 496:2-498:24.   However, Mr. Pinchuk's testimony was not credible as an expert.   Mr. Pinchuk's testimony consisted of essentially a recitation of his expert report and a National Highway Traffic and Safety Administration code.   *See id.* at 503:5-504:11; *id.* at 525:7-528:10.   Mr. Pinchuk opined that the VIN associated with the boat trailer at issue in this case could not be legitimate because the VIN associated with the boat trailer was only seven digits.   *Id.* at 505:6-9.   However, when confronted with questions regarding the National Highway Traffic and Safety Administration code at issue, Mr. Pinchuk was unable to credibly testify as to whether it is possible for a VIN to be only seven digits.   *Id.* at 518:14-519:13; *see also id.* at 522:4-523:11 (testifying that a VIN can only be assigned by a manufacturer and not a state motor vehicle department).   Therefore, the Court will afford Mr. Pinchuk's testimony little weight.

### 2.  The World Express Parties

Solovyev, Solovyeva, Bakhirev, Chernin, and Alper all at various points held positions within the entity Third-Party Defendants.

Even after trial, the exact scope of World Express's services is unclear.  According to Bakhirev, World Express mainly loaded cars to containers for shipment.  3/18/25 Tr. at 202:8-17.  However, according to World Express's website, World Express is an "international freight forwarding company" that is licensed for "U.S. trucking, air, and ocean freight shipping."  *Id.* at 206:22-207:2.  Marine Transport uses World Express as its container yard ("CY") and container freight station ("CFS").  SOF, ¶ 11.  Bakhirev was the owner of World Express from about 2010 to 2016.  *See* 3/17/25 Tr. at 148:14-17.  The timeline is unclear, but prior to Bakhirev, Solovyev owned World Express.  *See id.* at 148:22-24.  In 2016, Chernin briefly owned World Express.  3/18/25 Tr. at 218:4-16.  However, at some point in 2016, Bakhirev reacquired World Express.  *Id.* 219:25-220:9; *see also* SOF, ¶¶ 15, 18.  Around 2019, Bakhirev testified that World Express closed, and its assets were sold to Marine Transport.  3/18/25 Tr. at 211:3-18, 214:2-11.  During the pertinent period, Solovyev was the manager of car loading for World Express.  3/17/25 Tr. at 13:23-14:1.

Marine Transport is an international shipping company, providing freight forwarding and logistics services for ocean freight forwarding, air freight forwarding, cargo warehousing, customs clearance, and cargo consolidation services.  SOF, ¶ 7.  Marine Transport is licensed by the Federal Maritime Commission as a "non-vessel-operating common carrier."  *Id.* ¶ 4.  Alla Solovyeva owns Marine Transport.  3/19/25 Tr. at 389:11-14.  According to Solovyeva, Marine Transport handles all logistics required for international shipments, *i.e.*, what kind of

container is necessary for the shipment, date of shipment and arrival, and location for the delivery.  *Id.* at 390:2-393:13.

The precise services that Royal Finance performs also remain somewhat unclear. However, Royal Finance issued the invoices for the cars and boats at issue in this matter and collected the payments.   SOF, ¶¶25-29, 37-29, 42-43.   It appears to the Court that Royal Finance handled the entity Third-Party Defendants' invoicing and payment needs.

Car Express was a member of Copart, Inc. ("Copart"), an auction company, and purchased the at-issue boats from Copart.  *Id.* ¶¶ 12-13.   Solovyev owned Car Express.  *Id.* 3/17/25 Tr. at 14:13-17.   It appears that Car Express handled the actual purchases of the cars and boats.  *See* SOF, ¶ 13.

Vadim Alper a/k/a Dimitry Alper is the son-in-law of Solovyeva and Solovyev.   SOF, ¶¶ 21-22.   Alper served a "unique position of trust."   *Id.*   For example, Alper created Marine Transport's storage fee policy and served as a notary on various bills of sale.   *See* Alper Dep. Designations, D.E. 294-1, at 17:1-25; 91:22-92:25.   However, Alper's exact position within Marine Transport's corporate structure remains unclear to the Court.

As discussed above, Chernin was Director of World Express, and briefly owned World Express.   3/18/25 Tr. at 218:4-16; SOF, ¶¶ 15, 18.

### B.    The Parties' Working Relationship

Defendants primarily worked in the business of repairing and selling boats.   3/17/25 Tr. at 62:6-21.   Defendants also repaired cars.  *See id.* at 62:24-63:3.   Andrey Tretiyakov worked for one of Safonov's companies, Middle East Asia Alpha FZE.  *Id.* at 63:4-21.   Tretiyakov was a customer of Solovyev for several years prior to the boat purchases that resulted in this litigation.  *Id.* at 15:8-16.

6

Through Tretiykov, Solovyev and Safonov were connected.   *See id.*; *see also id.* at 64:6-8.   The three formed a business arrangement.   *Id.* at 64:15-23.   Solovyev had access to "Copart" boat auctions.   *Id.*   Solovyev would participate in the auction, Tretiyakov would consult Safonov on what boats to purchase, and Safonov would have the final say on purchasing the boats.   *Id.*   Solovyev received a commission based on the purchase of each boat.   *See id.* at 18:1-14.   All three would communicate via Skype Video Call while the auction was occurring. *Id.* at 64:24-65:1; *see also id.* at 15:24-16:22.   The Crocus Entities would receive a bill of sale for each boat.   *Id.* at 69:22-25.   After Safonov purchased a boat, Solovyev would then ship the boats to Dubai through Marine Transport.   *Id.* at 66:3-14.   Thereafter, an individual referred to as "Bartov" would ensure the boats properly proceeded through customs, and "clear the boats" in Dubai.   *Id.* at 69:9-20.   The Crocus Entities, through Tretiyakov and Bartov, would repair and then resell the boats.   *Id.* at 70:1-13.   Although Marine Transport shipped the boats, Safonov exclusively worked and communicated with Solovyev.   *Id.* at 66:20-24.   Defendants purchased ten to twenty boats using Solovyev's services, not including the three boats and two cars at issue here.   SOF, ¶ 14; 3/17/25 Tr. at 120:6-9; *id.* at 66:25-67:4.

### C.    The Boats

The Court will first address the three boats at issue in this matter:   a 2010 Formula boat (VIN # TNRD7870C010) (the "Formula"), *see* Ex. Cr-G; a 2008 Chaparral boat (VIN # FGBL 3738D808) (the "Chaparral"), *see* SOF, ¶ 28; Ex. Cr-B; a 2011 Monterey 20' boat (Vin # RGFMC1931011) (the "Monterey"), *see* SOF, ¶ 25, Ex. Cr-C.

In April and May 2013, the Crocus Entities purchased the Monterey and Chapparal boats. *See* Exs. Cr-B & Cr-C.   For each boat, Royal Finance issued an invoice to one of the Crocus

Entities.  *See* Exs. Cr-B & Cr-C.[5]  For the Monterey and Chapparal boats, the Crocus Entities

paid $15,455 and $14,855 for the boat cost, delivery, shipment to Dubai, commission,

documentation, and trailers to deliver the boats.  *See* Exs. Cr-B & Cr-C; SOF, ¶ 25-26, 28-29.

After the boats were purchased, they were delivered to Dubai in May 2013.  3/17/25 at 70:14-

20; Ex. Cr-A; *see also* SOF, ¶¶ 27, 30-31.

Defendants purchased the Formula boat from a Copart auction in August 2013.  *See*

SOF, ¶ 39; 3/17/25 Tr. at 15:17-16:1.  Safonov purchased the Formula in the same manner as

the other boats Safonov purchased through Solovyev—Solovyev presented the boat to

Tretiyakov and Safonov and Safonov approved of the purchase.  3/17/25 Tr. at 77:23-78:8; *id.* at

16:2-17:16; *see also* Ex. Cr-G.  On August 7, 2013, Royal Finance sent Defendants an invoice

of $59,780 for the Formula and delivery of the boat.  Ex. Cr-G.  On August 9, 2013, Crocus

Investments wired $59,780 to Royal Finance to pay for the Formula boat and its delivery.  SOF,

¶ 39; *see also* Ex. Cr-H (showing Safonov paid $59,780 from his checking account).  Neither

Safonov nor the Crocus Entities received a certificate of title or any other documents indicating

their ownership of the Formula boat.  3/17/25 Tr. at 78:9-18.

In connection with the Formula's delivery, Safonov purchased a boat trailer through

Solovyev.  *See* 3/17/25 Tr. at 79:2-8, 41:3-19.  On August 13, 2013, Crocus FZE wired $5,000

to Royal Finance for the trailer and a shipping documentation charge.  SOF, ¶ 40.  Safonov

never personally saw the trailer or the boat, only photos.  *See* Ex. P-4; 3/17/25 Tr. at 24:23-25:4,

---

[5]  The invoices indicate the entity was "Middle East Asia Alpha FZC."  *See* Exs. Cr-B & Cr-C.
Safonov testified that no entity with that name exists, and the invoices contain a typo.  3/17/25
Tr. at 109:9-25.  Safonov further testified the entity listed should be Defendant/Third-Party
Plaintiff Middle East Asia Alpha FZE.

79:2-22.    Safonov purchased a second trailer in December 2013.    *See* 3/17/25 Tr. at 79:12-19;

SOF, ¶¶ 41-42.    The reason for the second trailer is unclear.    Safonov stated that he forgot that

he had purchased the first trailer.    3/17/25 Tr. at 79:9-19.    Solovyev maintains that only one

trailer was purchased.    *Id.* at 41:7-19.    The record does establish, however, that Safonov paid

for two trailers.    *See* Exs. CR-H, CR-I, & J; SOF, ¶¶ 40-43; *see also* 3/17/25 Tr. at 97:25-98:5.

Third-Party Defendants are not in possession of the Certificate of Title for the boat trailer.    SOF,

¶ 44.

       Defendants purchased the Monterey and Chaparral boats so they could be repaired and

then resold.    3/17/25 Tr. at 70:1-4.    However, after they repaired the boats, they could not sell

the boats in Dubai.    *Id.* at 70:23-71:3    Thus, Defendants decided to have the Crocus Entities

ship all three boats to Florida via Marine Transport.    3/17/25 Tr. at 71:24-72:6.    Marine

Transport would first ship the boats to its storage lot in New Jersey, and then to Florida.    *Id.*

The reasoning for the boats first being sent to New Jersey and then Florida is not clear.    Safonov

testified that he understood it to be cheaper to send the boats to Solovyev and then have

Solovyev send the boats to Florida, rather than sending the boats directly to Florida.    *Id.* at

74:24-75:5; *see also id.* at 75:17-76:1.

       According to the parties' stipulated facts, the Monterey and the Chaparral arrived in New

Jersey on July 12, 2013.    *Id.* at 29:9-24; SOF, ¶¶ 32-33.[6]    On July 17, 2013, the boats were

---

[6]   The Stipulation of Facts contains a timeline of events regarding the three boats.    Even then, certain aspects of the relevant chronology remain unclear.    For the most part, the events leading to this litigation took place in 2013.    *See* SOF, ¶¶ 27-31, 39-43.    However, Paragraphs 32 through 34 of the Statement of Facts indicate that the Monterey and Chaparral were shipped to Dubai and then back to the United States in 2014.    *Id.* ¶¶ 32-34.    Although the exact dates are not material to the ultimate resolution of this matter, the Court will presume that the reference to the year 2014 was in error and that the Monterey and Chaparral were shipped to Dubai and back

delivered to Marine Transport's storage yard located in Bayonne, New Jersey. *Id.* ¶ 34. Solovyev then sent an invoice to Safonov for $1,500 for the expenses related to the boats' shipment. *Id.* at 72:17-73:1. As to the Formula, around February 2014, Safonov requested the boat be shipped to Florida with the Monterey and Chaparral. *Id.* at 80:12-81:1. However, Marine Transport never shipped the boats to Florida. *Id.* at 81:3-7. Safonov anticipated their delivery in July 2014. *Id.* at 80:24-81:7. According to Safonov, around this time, Solovyev stopped speaking with him. *Id.* at 81:3-7.

Safonov is unsure what ultimately happened with any of the three boats. *Id.* at 73:13-15, 81:13-14; 3/19/25 Tr. at 370:10-22. According to Solovyev, a garbage removal service destroyed and disposed of the Formula sometime in 2015. *See id.* at 49:24-51:9. As to the Monterey and Chaparral, the Crocus Entities initially sought the return of those boats through the Federal Maritime Commission in 2016. *Id.* at 137:17-139:1; 3/19/25 Tr. at 371:7-15. However, eventually the Crocus Entities abandoned seeking the return of the Monterey and Chaparral and instead sought only a return of the money paid for the boats. *See* 3/17/25 Tr. at 137:17-139:1. There is nothing in the record confirming that the boats were destroyed or otherwise disposed of.[7]

---

to the United States in 2013. No other evidence in the record indicates that the initial transportation of the Monterey and Chaparral occurred in 2014. *See* Ex. Cr-A (indicating the Monterey and Chaparral were shipped to Dubai on May 5, 2013).

[7] Solovyeva testified that she is unsure what ultimately happened with the Monterey and the Chaparral boats, but she told Solovyev to dispose of them. 3/19/25 Tr. at 474:7-18. She does not recall what happened to the Formula boat. *Id.* at 474:21-475:4.

### D.    The Cars

Also at issue are two automobiles:   a 2006 Mercedes SL65 (VIN # 3072) (the

"Mercedes"), *see* SOF, ¶ 23, Ex. Cr-T at DEF245; and a 2011 Porsche Panamera (VIN # 3072)

(the "Porsche"), *see* SOF, ¶ 23, Ex. Cr-T.   According to an invoice from the Crocus Entities, the

cost and expenses were $6,000 for the Mercedes, and $44,000 for the Porsche.   Ex. Cr-N.

However, according to an export declaration, the Mercedes was valued at $28,500 and the

Porsche was valued at $57,600 in August 2013.   Ex. Cr-U.

How the two cars came into Marine Transport's possession is not clear.   *See, e.g.*,

3/19/25 Tr. at 413:24-415:24.   Around 2006, a Florida company delivered the Mercedes to

Marine Transport's storage lot.   *Id.* at 413:4-8.   The Florida company requested Marine

Transport provide warehousing services and store the car.   *Id.* at 413:24-414:11.   Max

Ostrovsky arrived at Marine Transport and requested to pick up the vehicle.   *Id.* at 414:12-21.

Ostrovsky and the Florida companies had a dispute concerning the Mercedes.   *Id.*   After

resolving the issue, the Florida company "released" the Mercedes.   *Id.* at 414:22-415:1.

Ostrovsky left the Mercedes at Marine Transport's facility.   *Id.* at 415:2-9.   Ostrovsky never

paid the storage fees for the Mercedes, so after two years of storing the car, Marine Transport

considered the car to be "abandoned."   *Id.* at 416:11-18, 418:11-14.   However, Marine

Transport never formally asserted a lien on the Mercedes.   *See id.* at 429:21-431:16.   Further,

there is nothing in the record establishing that Marine Transport ever filed any paperwork, of any

kind, to change the ownership of the vehicle.   *See id.* at 419:14-24.   Instead, Marine Transport

sent what it represented to be an "official letter" that Marine Transport would confiscate the

Mercedes from Ostrovsky.   *Id.* at 431:7-21.

The Porsche was delivered to Marine Transport for loading and export.   *Id.* at 437:12-15.

No lien was formally asserted on the Porsche. *Id.* at 437:16-20. *But see* Ex. Cr-T, Interrogatory Response No. 3 (stating the Mercedes and Porsche were exported to Dubai for Sale "pursuant to Clause 15 of the [Marine Transport] House Bill of Lading ["LIEN"]"). The Salvage Certificate of Title associated with the Porsche indicates that "IAM & AL Group" owned the car as of April 2013. Ex. Cr-O at pg. 003-04; *see also* 3/19/25 Tr. at 446:16-447:13. There is nothing in the record indicating that Marine Transport took formal ownership over the Mercedes or the Porsche. The Court thus finds that Marine Transport did not have lawful ownership over the Mercedes or the Porsche.[8]

According to a bill of lading, Marine Transport received the Mercedes and Porsche for shipment to Dubai on August 13, 2013. Ex. P-6. The waybill indicates that Marine Transport shipped the cars on August 24, 2013. Ex. P-5. However, the Shipper Export Declaration indicates that Marine Transport shipped the cars on August 23, 2013. Ex. Cr-U at DEF0232. The declaration listed Car Express and Import, Inc. as the United States principal of interest ("USPPI"). *Id.* According to Solovyeva, the USPPI did not need to list the lawful owner of the vehicles. 3/19/25 Tr. at 453:8-18. Marine Transport did not conduct any due diligence on the owner because it was unnecessary for purposes of shipment. *Id.* at 453:14-455:3.

After the Crocus Entities received the cars, they set about repairing them. 3/17/25 Tr. at

---

[8]  Although not explained through any witness testimony, admitted in evidence is Exhibit Cr-R without objection. *See* 3/18/25 Tr. at 329:20-330:2. Exhibit R is a subpoena and response from Janet Wright on behalf of Copart, Inc. According to Ms. Wright's responses, the lots from which Car Express purported to have purchased the two cars do not match Copart's business records. Ex. Cr-R at DEF0003-0032. Specifically, the two lots Car Express represented as including the sales of the Mercedes and Porsche instead match the sales of a Chevrolet Silverado and a Chevrolet Impala. *Id.* at DEF0015-19. Given the lack of testimony concerning this exhibit, the Court affords this exhibit limited weight. However, it provides further support that Marine Transport did not have lawful ownership over the Mercedes or the Porsche.

82:14-16.   However, the cars were never sold.   *Id.* at 82:17-19.   When Safonov returned to

Dubai in August 2014, the cars were missing.   *Id.* at 82:21-83:2.   Specifically, in a Crocus

Entities' office, "everything that was there was stolen."   *Id.*   Safonov suspected Tretiyakov

stole the cars because before Safonov returned to Dubai, Tretiyakov stopped responding to

Safonov's inquiries.   *Id.*   Therefore, when Safonov returned to Dubai and saw the cars were

missing, he filed a police report on August 27, 2014 against Tretiyakov.   *Id.*; Ex. P-7.   Safonov

never saw the cars again.   Apparently, nothing came of the police report.   3/17/25 Tr. at 83:8-9,

124:18-125:17.

According to Solovyeva, Solovyev and Car Express sold the Mercedes for $3,800.

3/19/25 Tr. at 465:8-11.   Solovyeva could not verify if Solovyev and Car Express sold the car

for $3,800.   *See id.* at 464:17-467:1.   Solovyeva testified that all she cared about was whether

she and Marine Transport would recoup their expenses in storing and transporting the Mercedes.

*Id.* at 466:22-467:1.   However, there is no evidence verifying the Mercedes's sale or if any party

sold the Porsche.

### E.    The Parties' Business Arrangement Concerning the Formula's Storage and the Vehicles

After Safonov purchased the Formula boat but before World Express shipped to the

Crocus Entities, World Express stored the boat at Marine Transport's facility.   *See* 3/17/25 Tr. at

19:3-21.   The parties disagree about the circumstances of Marine Transport and World

Express's storage of the Formula.   Specifically, Solovyev maintains that there was never an

agreement related to the storage of both the cars and the Formula.   However, Safonov testified

that the very purpose of the Crocus Entities' receipt, repair, and attempted sale of the cars was to

compensate Solovyev for the Formula's storage.   The Court cannot reconcile Safonov's and

Solovyev's differing views as to the storage of the Formula, the Mercedes, and the Porsche. The Court must therefore decide which party's version to accept based upon the parties' respective credibility.   In making a credibility determination regarding the testimony of witnesses, the Court must consider:   demeanor and tone of voice, *see Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); basis of knowledge, outside influence, bias, and extent to which testimony is self-servicing, *see Dardovitch v. Haltzman*, 190 F.3d 125, 140-41 (3d Cir. 1999); evidentiary support for testimony, *see United States v. Kole*, 164 F.3d 164, 177 (3d Cir. 1998); and whether the testimony is coherent, plausible, and internally consistent, *see Newark Branch, N.A.A.C.P. v. City of Bayonne*, 134 F.3d 113, 120 (3d Cir. 1998).

According to Solovyev, after Safonov purchased the Formula boat, Marine Transport was to ship the boat to Dubai.   *Id.* at 19:3-12.   However, Safonov never informed him what to do with the boat.   *Id.* at 19:15-21.   Solovyev testified that World Express's general policy was that it would store the boat for a few days, and then the customer would have to pay for continued storage.   *Id.* at 25:25-26:1.   Solovyev further testified that Royal Finance issued invoices for the Formula boat for storage fees starting on August 13, 2014.   *Id.* at 20:23-21:10; *see also* Ex. P-3. According to Solovyev, because of the size of the boat, the boat's storage fees were $105.31 per day.   *See id.* at 21:3-10; Ex. P-3 at 3.   Further, Solovyev stated that he told Safonov "[m]any, many times" that if he did not pay for the storage, Safonov could not retrieve the Formula boat. 3/17/25 Tr. at 25:19-23.

However, there is no written contract or agreement to establish that Crocus agreed to pay for the Formula's storage at World Express.   *Id.* at 40:12-15.   And although Solovyev testified that he sent numerous letters and emails to Safonov informing him of World Express's storage

policies, *id.* at 25:19-26:6, neither World Express nor the Third-Party Defendants introduced any such communications at trial.   Solovyev maintained that he never told Safonov that World Express would store the Formula boat at no cost, but offered precious little at trial to establish what specific storage fees or charges he intended to impose.   *Id.* at 29:2-7.

Safonov testified that Solovyev sent the Mercedes and Porsche to Dubai.   *Id.* at 81:23-82:2.   According to Safonov, Solovyev sent the Mercedes and Porsche to Dubai for sale and repair.   *Id.* at 82:6-13.   Further, Safonov testified that he would pay the expenses, customs fee, storage, and repairs in exchange for Solovyev storing the Formula boat.   *Id.*; *see also id.* at 128:24-129:1.   Specifically, Solovyev wanted to sell the Porsche for at least $50,000 and the Mercedes for at least $5,000.   *Id.* at 132:18-24.   Safanov would be able to keep for himself any money beyond those amounts.   *Id.* at 133:5-7.   According to Safonov, this agreement was in place so that he would not need to pay for the Formula boat's storage.   *Id.* at 129:24-130:4.

While the exact parameters of the agreement between Solovyev and Safonov are unclear, and there is a lack of evidentiary support for either theory, the Court finds Safonov's testimony concerning the storage of the Formula boat, and the arrangement for the repair and sale of the vehicles, to be more credible than Solovyev's testimony.   First, based upon Solovyev's testimony, Marine Transport and World Express had a policy to charge customers for storage after a period of a few days.   *Id.* at 25:25-26:1.   However, according to Plaintiff's exhibits, Solovyev and Royal Finance did not begin issuing invoices to Defendants for the Formula boat's storage until August 13, 2014—more than a year after Crocus Investments paid Royal Finance for the Formula boat in August 2013.   Ex. P-3; SOF, ¶¶ 37-40.   Further, Royal Finance issued the first invoice for the Formula boat's storage in or around August 2014, which was when

Safonov returned to Dubai to inquire about the cars.    *See* Ex. P-3; 3/17/25 Tr. at 82:21-83:2.

Second, there is no evidence, contrary to Solovyev's testimony, that he continually informed Safonov that he could not pick up the Formula boat unless Safonov paid for the storage.    *Id.* at 25:21-26:1; *see also id.* at 45:12-20 ("Unfortunately, sir, it was minimum 10 or 15 official letters sent by Fed Ex to the address of Safonov.    It was e-mails which was sent numerous times as an official letter to pick up his boat and pay for the storage.    I don't understand how come we don't have this supported information in the file right now but it was sent . . . a million times.").

Third, neither Solovyev nor the other Third-Party Defendants testified as to a plausible explanation for their transfer of the cars to Safonov.    Solovyev denied the existence of any arrangement whereby the Formula would remain in storage in exchange for the repair and sale of the Mercedes and Porsche.    3/17/25 Tr. at 40:16-22.    This is the only testimony from Solovyev regarding the two cars and the sale thereof.    However, Alla Solovyeva testified that she contacted Solovyev and asked him to assist her "to get rid of" the Mercedes.    3/19/25 Tr. at 416:11-20.    Further, Solovyeva testified that she did not care what the Mercedes sold for because she wanted only to recoup her expenses in storing the car—approximately $3,800.    *Id.* at 467:24-470:3.    And as noted above, there is a paucity of evidence that Solovyev or Marine Transport ever lawfully possessed either car.    Indeed, Solovyeva's testimony confirmed that neither she, nor Solovyev, nor Marine Transport ever filed a lien or other formal paperwork to assert ownership of the cars.    *See id.* at 419:14-24, 437:16-20.

In sum, Solovyev's testimony is self-serving.    *See Dardovitch v. Haltzman*, 190 F.3d at 140-41.    Solovyev did not testify as to anything related to the two cars.    When asked about the

two cars, he denied any arrangement of any kind.   3/17/25 Tr. at 29:2-7.   Instead, he maintained

that he continually requested payment for the Formula boat storage.   *Id.* at 25:19-23.   Further,

there is no evidentiary support for his testimony.   *See United States v. Kole*, 164 F.3d at 177.

Solovyev contended that he sent numerous letters to Safonov to collect payment for the cars.

3/17/25 Tr. at 25:19-26:6.   However, none of those letters were offered into evidence.   The only

evidence to support Solovyev's testimony that he intended to charge storage fees from Safonov

are invoices starting in August 2014.   Ex. P-3.   Finally, Solovyev's testimony is inconsistent

with Alla Solovyeva's testimony.   *See Newark Branch, N.A.A.C.P. v. City of Bayonne*, 134 F.3d

113, 120 (3d Cir. 1998).   Solovyev maintained that there was no arrangement, yet he failed to

explain why he sent the cars to Safonov.   Instead, Alla Solovyeva testified that she wanted to get

rid of the cars from her lot and asked Solovyev to assist her.   *See id.* at 416:11-22, 419:14-24,

437:16-20.   If the Court accepted Solovyev's testimony, there would have been no reason to

ship the cars to Safonov.   In other words, there would be a factual gap in the record.

On the other hand, Safonov's testimony is consistent with the evidence in the record,

although that evidence is limited.   Safonov testified that he understood the arrangement between

himself and Solovyev to be:   Solovyev would store the Formula boat without payment and, in

exchange, Safonov would repair and sell two cars from Solovyev in Dubai.   3/17/25 Tr. at 82:6-

13; *see also id.* at 128:24-129:1.   There is evidence consistent with Safanov's testimony.

Safonov paid for the Formula boat on August 9, 2013.   SOF, ¶ 39.   Marine Transport Logistics

shipped the cars to Dubai in August 2013 and delivered them in September 2013.   Ex. P-5.

Until August 2014, Solovyev did not issue an invoice to Safonov for the Formula boat's storage.

Ex. P-3.   Around that time, the cars went missing in Dubai, and Safonov filed a police report

accusing Tretiyakov of stealing the cars.   *See id.* at 82:21-83:2; Ex. P-7.   Thus, Safonov's

testimony that he and Solovyev had an agreement that Safonov's sale of the two cars would

offset the storage charges for the Formula boat is supported by the evidence in the trial record.

*See United States v. Kole*, 164 F.3d at 177.   Based on the timing of the Royal Finance invoices,

Solovyev did not seek payment for the Formula boat's storage until the cars were stolen (*i.e.*,

until his consideration—what would have been recouped by the sale of the cars—was stolen).

Thus, the Court finds that there was an arrangement by which Safonov would repair and sell the

Mercedes and Porsche and, in turn, Solovyev would store the Formula boat for free.

It appears that after Solovyev sent Safonov an invoice for the Formula boat's storage, the

working relationship between the parties ended.   This lawsuit followed.

## IV.   JURISDICTION

This Court has subject matter jurisdiction over the parties' respective claims under 28

U.S.C. § 1332, because the Plaintiff is incorporated and maintains its principal place of business

in New Jersey, and the Defendants/Third-Party Plaintiffs are foreign and Florida citizens.   *See*

Final Pretrial Order, Jan. 6, 2025, D.E. 277, at page 2.   The amount in controversy exceeds

$75,000 exclusive of interests, costs and fees.   *Id.*

## V.   CONCLUSIONS OF LAW

The issues before the Court are:   (1) whether Plaintiff is entitled to fees associated with

its storage of the Formula boat from Defendants; (2) Defendants' fraud claims against Plaintiff

and Third-Party Defendants; and (3) Defendants' civil conspiracy claims against Third-Party

Defendants.   The Court addresses each set of claims in turn.

### A.   World Express's Claim for Storage Fees Against Defendants

Plaintiff contends it is entitled to storage fees totaling $20 per day for each day World

18

Express stored the Formula boat.   Pl.'s Trial Br., D.E. 298, at 4.   Plaintiff does not provide a total for the alleged damages.   Instead, Plaintiff submits it is entitled to "reasonable compensation for storing the Formula boat all these years."   *Id.* at 2.   Plaintiff's claim is premised upon common law bailment and, alternatively, quantum meruit.   *Id.* at 1-3.   However, Plaintiff has failed to meet its burden in establishing either claim.

As to bailment, "[a] bailment may be created by contract, either express or implied, or by operation of law or statute."   *LaPlace v. Briere*, 404 N.J. Super. 585, 598 (App. Div. 2009) (citing *Cerreta v. Kinney Corp.*, 50 N.J. Super. 514, 517 (App. Div. 1958)).   A bailment arises when someone leaves his/her chattel on the premises of another "if the latter is given primary control of the chattel for the time being."   *LaPlace*, 404 N.J. Super. at 598 (quoting *Moore's Trucking Co. v. Gulf Tire & Supply Co.*, N.J. Super. 467, 469-70 (App. Div. 1952) (listing examples such as jewelry left with a swimming pool attendant, "diamonds delivered to a retail jeweler 'on memorandum' for sale[,]" a car left in a shop to be washed, and an "airplane stored in a hangar")).   Further, the bailor must have "possession and primary control" over the chattel. *City of Jersey City v. Liggett & Myers Tobacco Co.*, 14 N.J. 112, 115 (1953).   Where possession has been acquired by an agreement that has been since terminated for another purpose, the possessor should keep the chattel "safely and restore or deliver it to its owner."

"Where possession has been acquired . . . by an agreement for some other purpose since terminated, the possessor, 'upon principles of justice,' should keep it safely and restore or deliver it to its owner."   *Capezzaro v. Winfrey*, 153 N.J. Super. 267, 271 (App. Div. 1977) (citing *State v. Carr*, 188 N.J.L. 233, 234 (E. & A. 1937)).   In those circumstances, courts consider "quasi-contracts of bailment or constructive and involuntary bailments."   *Capezzaro*, 153 N.J. Super. at

19

271 (citing *Carr*, 188 N.J.L. at 234).

It is not disputed that when Defendants stored the Formula boat on World Express's storage lot, World Express lawfully obtained possession of the Formula boat.   *See City of Jersey City*, 14 N.J. at 115.   Thus, World Express became the Formula's bailee when it came into possession of the Formula.   *See also World Express & Connection, Inc. v. Crocus Invs., LLC*, No. 15-8126, 2020 WL 5088633, at *15 (D.N.J. Aug. 28, 2020) (McNulty, J.)

As to storage fees under a theory of bailment, courts recognize that a bailee has a "right to recoup unpaid storage fees."   *Weissman v. Williams*, No. 15-40, 2017 WL 11404587, at *17 (M.D. Ga. Sept. 29, 2017); *see also Woods v. Pullman*, No.22-497, 2023 WL 4174475, at *4 (E.D. Va. June 26, 2023) ("[B]y failing to pay his storage fees, [the plaintiff] violated the bailment.").

Quantum meruit is a form of quasi-contractual recovery and "'rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437 (1992) (quoting *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966)).   For a party to recover under quantum meruit, a party must show:   "(1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) a showing of the reasonable value of the services."   *Premio Foods, Inc. v. Purdue Farms, Inc.*, No. 11-4968, 2012 WL 3133791, at *4 (D.N.J. July 30, 2012) (citing *Starkey, Kelly, Blaney & White v. Est. of Nicolaysen*, 172 N.J. 60, 68 (2002)).

Under both bailment and quantum meruit theories, Plaintiff fails to satisfy its burden that it is entitled to storage fees for the Formula boat.   Specifically, Plaintiff cannot establish that it

reasonably expected to be paid storage fees from Defendants.   First, there is no evidence that Defendants expected to pay Plaintiff for the Formula boat's storage fees, nor that Defendants had any notice that Plaintiff expected them to pay.   Although Plaintiff posits that it always contemplated payment for the Formula boat's storage, there is no written contract or agreement demonstrating that arrangement.   *See* 3/17/25 Tr. at 40:12-15.   And despite Solovyev's testimony that he sent letters and emails to Safonov about World Express's storage policies and requesting payment, none of the letters or emails was produced at trial.   *Id.* at 25:19-26:6. Indeed, the only evidence Plaintiff and Third-Party Defendants produced at trial demonstrating any reasonable expectation of payment for the Formula's storage was Royal Finance's invoice to Defendants.   *Id.* at 20:23-21:10; *see also* Ex. P-3.   However, that invoice confirms that Plaintiff did not have an expectation of payment.   The invoice is dated August 13, 2014—approximately one year after World Express started storing the boat.   Ex. P-3.   Thus, although Plaintiff contends that it always expected to be paid for the Formula boat's storage, the first documented request for payment was not until a year after Plaintiff began storing the boat.

Second, and as explained above, there was an arrangement between Safonov and Solovyev whereby Solovyev would store the Formula boat and in exchange Safonov would repair and sell the Porsche and Mercedes.   3/17/25 Tr. at 82:6-13; *see also id.* at 128:24-129:1. As this Court has already concluded, that testimony is consistent with evidence in the record. Safonov paid for the Formula boat on August 9, 2013.   SOF, ¶ 39.   Shortly thereafter, Marine Transport shipped the cars to Dubai.   Ex. P-5.   Solovyev did not request payment for the Formula's storage until the two cars went missing in August 2014.   Ex. P-3.   *See* 3/17/25 Tr. at 82:21-83:2; Ex. P-7.   Thus, the Court found *supra* that there was an arrangement by which

Safonov would repair and sell the Mercedes and Porsche and, in turn, Solovyev would store the Formula boat for free.

Third, this Court concluded in its Opinion granting in part and denying in part the parties' respective summary judgment motions that Marine Transport paid World Express approximately $34,000 for the Formula boat storage. *World Express & Connection, Inc.*, 2020 WL 5088633, at *16 (McNulty, J.); *see also* Exs. Cr-P & Cr-Q (invoices from World Express to Marine Transport indicating the invoices were paid). The law of the case doctrine prevents this Court from relitigating an issue that has already been decided in this litigation. *See Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003) (quoting *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002)). Under this doctrine, the Court cannot reconsider previously decided issues absent one of three exceptions: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Pub. Interest Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116–17 (3d Cir. 1997). None of the exceptions applies here, and there is no evidence contrary to the Court's prior ruling. Further, Plaintiff does not present argument to rebut this Court's prior ruling. *See generally* Pl.'s Tr. Br., D.E. 298.

In sum, under either theory, the Court concludes that Plaintiff did not have a reasonable expectation that Defendants would pay a per-diem storage fee for the Formula boat. Plaintiff did not issue invoices to Defendants until a year after Plaintiff started storing the Formula boat. There is credible testimony that the reason Plaintiff did not issue an invoice for storage fees was due to a separate agreement that the cost of the Formula's storage would be offset by the profits derived from the repair and sale of the Mercedes and Porsche. Further, the Court has already

22

determined that Marine Transport paid World Express for the Formula's storage.   Thus, Plaintiff

has failed to meet its burden to demonstrate any storage fees owed under either bailment or

quantum meruit.

Finally, even if Plaintiff did sustain its burden, Plaintiff does not provide a "showing of

the reasonable value of the services."   *Premio Foods, Inc.*, 2012 WL 3133791, at *4 (citing

*Starkey, Kelly, Blaney & White*, 172 N.J. at 68).   Plaintiff states:

> As far as calculating the damage in terms of cost for storage per
> day, we have in evidence as Plaintiff's Exhibit 1 a Tariff that is
> filed with the Federal Maritime Commission that lists $20/day for
> storage of boats.

Pl.'s Br., D.E. 298, at 4.

Plaintiff does not give the Court any parameters to calculate the reasonable value of the

services.   There is no timeline of how long World Express stored the Formula boat.   Further,

Plaintiff's Exhibit 1 is a Tariff sheet presented without context—through testimony or briefing.

According to Exhibit 1, Marine Transport—not World Express—was to provide thirty days free

storage.   Ex. P-1.   After thirty days, Marine Transport could charge $20 per day.   This exhibit

alone does little to establish what a reasonable value of services would be.   If Plaintiff had

shown a reasonable expectation of compensation, which it did not, the Court would be required

to essentially guess at what a reasonable value of those services would be.   In sum, Plaintiff has

likewise failed to satisfy its burden to establish the proper compensation for its storage of the

Formula boat.

### B.      Defendants/Third-Party Plaintiffs' Claims

#### 1.   Fraud

There are five elements of common law fraud:   (1) a material misrepresentation of a

presently existing or past fact; (2) knowledge or belief by a party of the fact's falsity; (3) intent

that another person rely on that misrepresented fact; (4) reasonable reliance upon that fact; and

(5) damages resulted because of the misrepresentations.   *Gennari v. Weichert Co. Realtors*, 148

N.J. 582, 610 (1997) (citing *Jewish Ctr. Of Sussex Cnty. v. Whale*, 86 N.J. 619, 624-25 (1981)).

Fraud requires a heightened quantum of proof, because "allegations of fraud must be proved by

clear and convincing evidence."   *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.

1988) (citing *Vanguard Telecomm., Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1187

(D.N.J. 1989), *aff'd*, 900 F.2d 645 (3d Cir. 1990); *Fox v. Mercedes-Benz Credit Corp.*, 281 N.J.

Super. 476, 484 (App. Div. 1995)).

Notably here, "[s]tatements as to future or contingent events, to expectations or

probabilities, or as to what will or will not be done in the future, do not constitute

misrepresentations, even though they may turn out to be wrong."   *Alexander*, 911 F. Supp. at

435 (citing *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F. Supp. 738, 749 (D.N.J.

1979)); *see also Notch View Assoc., A.D.S. v. Smith*, 260 N.J. Super. 190, 202-03 (Law Div.

1992) (stating statements as to future event do not qualify as a misrepresentation absent an intent

to deceive).   Moreover, a statement is considered a fact rather than an opinion (*i.e.*, puffery), if

the statement is susceptible of exact knowledge.   *Alexander*, 911 F. Supp. at 435 (citing *Diaz v.

Johnson Matthey, Inc.*, 869 F. Supp. 1155, 1165 (D.N.J. 1994)).   Further, the statement must be

made with the intent to deceive.   *Notch View Assoc., A.D.S.*, 260 N.J. Super. at 202-03.   In

other words, the defendant must have "no intention at the time he[/she] makes the statement of

fulfilling the promise."   *Id.* at 203.

Defendants argue there were three misrepresentations concerning "the ownership, title,

status, and handling" of the Formula, Monterey, Chaparral, as well as the Mercedes and Porsche. Def. Tr. Br., D.E. 305, at 8.   First, as to the boats, Defendants contend that the Crocus Entities expected to receive the boats after paying for them.   However, the Third-Party Defendants represented that the boats were "no longer intact or deliverable." *Id.*   Second, Defendants maintain that Solovyev, on behalf of World Express and Marine Transport, misrepresented that the Formula boat would be stored at no additional cost.  *Id.* at 9.   Defendants contend that the misrepresentation as to the storage was to induce Crocus into "the car scheme."  *Id.*   Third, as to the Mercedes and Porsche, Defendants argue that the Third-Party Defendants represented that they had the right to sell and/or transfer the Mercedes and Porsche, but separate third parties were truly the lawful owners.  *Id.* at 8.

The Court concludes that Defendants have failed to demonstrate by clear and convincing evidence that these actions constitute fraud.   The Court will address each alleged fraud in turn.

### i.   The Formula, Monterey, and Chaparral

There are critical errors in Defendants' theory as to the Formula, Monterey, and Chaparral boats.   First, and most prominently, Defendants are unable to establish the Third-Party Defendants made a misrepresentation of a then-existing fact with the intent to deceive Defendants.   In Defendants' view, the Third-Party Defendants misrepresented that Defendants would receive the boats after their purchase.   Def. Tr. Br., D.E. 305, at 8.   Thus, Defendants argue that because they never actually received the boats, this constitutes a misrepresentation. *Id.*  But there is no evidence that at the time Solovyev represented that Defendants would receive the boats, that statement was made with an intent to deceive.  *See Notch View Assoc., A.D.S.*, 260 N.J. Super. at 202-03 ("[T]he defendant must have no intention at the time he makes

25

the statement of fulfilling the promise." (quoting *Capano v. Borough of Stone Harbor*, 530 F.

Supp. 1254, 1264 (D.N.J. 1982))).    Indeed, the Third-Party Defendants' nonperformance alone

"is insufficient to show that [they] had no intention of performing."    *See Notch View Assoc.,*

*A.D.S.*, 260 N.J. Super. at 203.

The testimony and evidence produced at trial more closely demonstrates a business

arrangement gone awry, leading to the circumstances giving rise to this litigation.    Solovyev and

Safonov purchased ten to twenty boats together without issue before the Monterey, Chaparral,

and Formula boat purchases.    SOF, ¶ 14; 3/17/25 Tr. at 120:6-9; *id.* at 66:25-67:4.    The three

boats were purchased in April, May, and August 2013.    *See* Exs. Cr-B & Cr-C; SOF, ¶ 39;

3/17/25 Tr. at 15:17-16:1.    Marine Transport shipped the Monterey and Chaparral to Dubai and

then back to the United States that summer.    3/17/25 at 70:14-20; Ex. Cr-A; *see also* SOF, ¶¶

27, 30-33.    Marine Transport stored the Formula boat on its lot after Defendants purchased the

boat.    *See* SOF, ¶ 34.    Ultimately, Marine Transport was to ship the boats to Florida.    3/17/25

Tr. at 80:12-81:1.    Safonov anticipated the boats' delivery for July 2014.    *Id.* at 80:24-81:7.

However, around this time, the parties began disputing whether Safonov owed Solovyev costs

for storing the Formula boat.    *See* Ex. P-3; 3/17/25 Tr. at 82:21-83:2.    Solovyev maintains that

he did not release and ship the boats to Safonov because of the unpaid storage fees.    3/17/25 Tr.

at 25:19-23.    Although the Court has already determined that Safonov and Solovyev had a

separate arrangement where the Mercedes and Porsche's resale would cover the storage fees,

Solovyev's testimony and the evidence are consistent—Solovyev did not release the boats

because he believed Safonov owed him compensation in one form or another.

As such, there is no evidence to suggest that Solovyev never intended on releasing the

boats.   The parties had worked together ten to twenty times prior to this dispute.   The parties

were seemingly in communication from August 2013 to July/August 2014 when the dispute

arose.   The evidence shows that Solovyev refused to release the boats because of this later

disagreement.   Thus, in the absence of evidence that when Solovyev represented that Safonov

would receive the boats, he had no intention of actually furnishing the boats to Safonov, this was

not a misrepresentation even though it later turned out to be wrong.   *Alexander*, 911 F. Supp. at

435.

Defendants additionally posit that Solovyev and the Third-Party's representation that the

boat was destroyed or otherwise disposed of amounts to a misrepresentation.   Def. Tr. Br., D.E.

305, at 8-9.   However, there are multiple issues with Defendants' argument and theory.   First, it

is unclear when this alleged misrepresentation occurred.   Defendants vaguely claim "[w]hen . . .

Safonov inquired about the missing boats, Solovyev falsely told him that the boats had been

'demolished' or ruined—essentially claiming the boats were no longer intact or deliverable."

*Id.*   There are no further details as to when this misrepresentation occurred.   Based on

Safonov's testimony, it appears that this representation might have occurred in 2016 and again in

2019.   3/19/25 Tr. at 371:10-22.   Safonov testified that in 2016, Solovyev told him that the

boats were destroyed, in connection with a related matter pending before the Maritime

Commission.   *Id.* at 371:10-19.   As to the 2019 representation, Safonov testified that Solovyev

said the same thing during a settlement conference before the Undersigned.   *Id.* at 372:19-25.

Second, these alleged representations occurred after the litigation began and are not

contained in Defendants' pleadings or the Final Pretrial Order.   Third Party Compl., Sept. 21,

2016, D.E. 17; Final Pretrial Order, Jan. 6, 2025, D.E. 277.   Thus, the Defendants are attempting

to constructively amend their claims.   Defendants did not move to amend their claims to include

these additional representations.   Under Federal Rule of Civil Procedure 15(b)(2), "[w]hen an

issue not raised by the pleadings is tried by the parties' express or implied consent, it must be

treated in all respects as if raised in the pleadings."   In assessing whether a party impliedly gave

consent, courts look to "whether the parties recognized that the unpleaded issue entered the case

at trial, whether the evidence that supports the unpleaded issue was introduced at trial without

objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity

to respond."   *Addie v. Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013) (quoting *Douglas v. Owens*, 50

F.3d 1226, 1236 (3d Cir. 1995)).   Further, "an issue has not been tried by implied consent if

evidence relevant to the new claim is also relevant to the claim originally pled, because the

defendant does not have any notice that the implied claim was being tried."   *Addie*, 737 F.3d at

867 (quoting *Douglas*, 50 F.3d at 1236).

Here, the evidence on which Defendants rely to support the unpleaded issue was not

admitted at trial.   Indeed, these representations are statements that occurred in settlement offers

and negotiations between Safonov and Solovyev.   Federal Rule of Evidence 408 instructs that "a

statement made during compromise negotiations about the claim" is not admissible.   Further,

Safonov's testimony concerning this representation is based upon evidence he discovered on

Copart's public auction website.   As the Court twice ruled at trial, testimony based on the

screenshots of the Copart public auction website constituted inadmissible hearsay.   *See* 3/19/25

Tr. at 365:17-368:1; 377:22-378:25; 379:2-15; 380:12-381:22.   Defendants admit as much in

their briefing papers.   Defs. Tr. Br., D.E. 305, at 8-9 ("Although the Court sustained a hearsay

objection as to the details of the Copart listing . . . .").   Thus, "the evidence that supports the

28

unpleaded issue was" not introduced without objection.

Moreover, the new claim is intrinsically linked to Defendants' prior claims concerning the alleged misrepresentations inducing their purchase of the boat. Indeed, the new claim is essentially a continuation of Defendants' prior claim. Thus, there would have been no way for Plaintiff and Third-Party Defendants to have had fair notice of Defendants' claim that representations as to the disposition of the boat would be introduced. *See Addie*, 737 F.3d at 867.

Therefore, the Court concludes that Defendants waived their fraud claim concerning Solovyev's representations as to the status of the boats. They never sought to properly amend their pleadings to introduce such a claim, and failed to give notice of it in the Final Pretrial Order, and the new claim is intrinsically related to the Defendants' existing claim. Further, the evidence on which they attempted to rely at trial was deemed inadmissible.

### ii. The Formula's Storage and the Cars

Defendants contend that the cars were stolen property that Plaintiff and Third-Party Defendants could not have legitimately transferred to Defendants. Defs.' Tr. Br., D.E. 305, at 8. Further, Plaintiff and the Third-Party Defendants utilized the promise of the cars in exchange for free storage of the Formula boat. *Id.* at 9. However, in Defendants' view, Plaintiff and Third-Party Defendants either (1) never intended to honor this arrangement or (2) later reneged on the promise. *Id.*

As the Court concluded earlier in this Opinion, there was an agreement among the parties where Solovyev would send the two cars to Safonov for repair and resale and, in exchange for the profits of the cars' resale, Solovyev would store the Formula boat without cost. Defendants

29

are correct that at bottom, neither Plaintiff nor any Third-Party Defendant had lawful ownership over the cars when Marine Transport shipped them to Safonov in Dubai.   Thus, there was a material misrepresentation as to a presently existing fact.   *See Gennari*, 148 N.J. at 610. Further, based upon Alla Solovyeva's testimony, it is clear that Third-Party Defendants knew that they did not have lawful possession of the vehicles.   *See* 3/19/25 Tr. at 429:21-431:21, 437:16-20 (Solovyeva testifying no lien was asserted on either vehicle).   Although Solovyeva maintains that Marine Transport "confiscated" the cars, absent any legitimate legal claim to the cars, that testimony is not credible.   Thus, there was a knowledge or belief by Third-Party Defendants that they did not have lawful possession of the vehicles.   *See Gennari*, 148 N.J. at 610.

As to intent and reasonable reliance on that fact, Safonov reasonably relied on Third-Party's misrepresentation.   Defendants expended approximately $50,000 in repairs for the two cars pursuant to the parties' arrangement for the Formula boat's storage.   *See* Ex. Cr-N. Further, the Court concludes that Solovyev clearly intended for Safonov to rely on that misrepresentation to recoup the Plaintiff and Third-Party Defendants' costs for storing the Formula boat.

However, Defendants have failed to demonstrate that damages resulted because of the misrepresentations.   Defendants incurred $50,000 in costs related to the cars.   Ex. Cr-N.   But those damages occurred because the cars went missing, not due to any misrepresentation by the Third-Party Defendants.   *See* 3/17/25 Tr. at 82:21-83:2.   Safonov himself suspected Tretiyakov stole the cars because before Safonov returned to Dubai to check on the cars, Tretiyakov cut off all communications with Safonov.   *Id.*   Safonov then filed a police report and alleged that

Tretiyakov stole the cars. *Id.*; Ex. P-7.

Therefore, the connection between Defendants' losses and the misrepresentations as to the cars and storage fees are too attenuated because of the intervening act of the alleged theft of the cars. *See DeRobbio v. Harvest Communities of Sioux City, Inc.*, No. 01-1120, 2002 WL 31947203, at *5 (D.N.J. Oct. 30 2002) (stating the causal chain was broken between the defendants' fraud and plaintiffs' losses because of intervening factors and acts). As Safonov testified, he believed Tretiyakov stole the cars. 3/17/25 Tr. at 82:21-83:2. In other words, the actions of a third party caused Defendants' damages. Defendants have presented no evidence to connect the alleged theft of the cars with Plaintiff and Third-Party Defendants. Without that connection, the Court must conclude that Defendants have not demonstrated by clear and convincing evidence that Third-Party Defendants' misrepresentation as to the cars caused their economic losses in repairing the two cars.

## 2. Civil Conspiracy

Defendants contend that in connection with the alleged fraud, Third-Party Defendants engaged in a civil conspiracy to defraud Defendants. The elements of civil conspiracy are: (1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages. *Board of Ed. of the City of Asbury Park v. Hoek*, 66 N.J. Super. 231, 241 (App. Div. 1961), *rev'd in part on other grounds*, 38 N.J. 213 (1962). However, a plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the "exact limits of the illegal plan or the identity of all participants," as long as a plaintiff alleges that each participant shared in "the general conspiratorial objective." *Morgan v. Union*

31

*County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 365 (App. Div. 1993).

A civil action for conspiracy is essentially a tort action.   Therefore, to maintain an action for civil conspiracy, a plaintiff must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause.   *Hoek*, 66 N.J. Super. at 241.   "[T]he conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors."   *Hoek*, 66 N.J. Super. at 241. The actionable element is the tort which the defendants agreed to perpetrate and which they committed.   *Landriani v. Lake Mohawk Country Club*, 26 N.J. Super. 157, 159 (App. Div. 1953).

Accordingly, to sustain a claim of civil conspiracy, the Defendants first must demonstrate an underlying tort.   Here, the Defendants rely on their allegations of fraud against the Third-Party Defendants.   As discussed above, Defendants have failed to demonstrate the underlying tort.   Therefore, there can be no civil conspiracy because no unlawful purpose was proven.

Thus, the Court likewise concludes that Defendants have failed to meet their burden in establishing a civil conspiracy claim.

## VI.    CONCLUSION

For the foregoing reasons, the Court declines to enter judgment for either party's claims.

*s/Michael A. Hammer*
**United States Magistrate Judge**

**Dated: September 2, 2025**

# APPENDIX

## EXHIBITS ADMITTED INTO EVIDENCE

| Ex. | Description of Exhibit |
|---|---|
| P-1 | Marine Transport Logistic, Inc. – FMC Tariff Page, February 28, 2012 |
| P-2 | World Express & Connections, Inc. Lease Agreement, November 28, 2007 |
| P-3 | Invoices from Royal Finance to Crocus Entities, August 13, 2014 to May 15, 2017 |
| P-4 | Photograph of a boat trailer |
| P-5 | MAERSK Line Non-Negotiable Waybill |
| P-6 | Marine Transport Logistic, Inc. Bill of Lading |
| P-7 | Sharjah Police Headquarters Report, August 27, 2014 |
| Cr-A | Marine Transport Logistic, Inc. Bill of Lading |
| Cr-B | Royal Finance Invoice Regarding Chaparral Boat to Middle East Asia Alfa FZE, May 7, 2013 |
| Cr-C | Royal Finance Invoice Regarding Monterey Boat to Middle East Asia Alfa FZE, April 18, 2013 |
| Cr-D | Payment Confirmation for "Boats" to Royal Finance, April 25, 2013 |
| Cr-G | Royal Finance Invoice Regarding Formula Boat to Alexander Safonov, August 7, 2013 |
| Cr-H | Bank Account Deduction Page PNC Bank, August 2013 |
| Cr-I | Royal Finance Invoice Regarding Formula Boat's Trailer to Crocus FZE, December 3, 2013 |
| Cr-J | Payment Confirmation for Formula Boat Trailer to Royal Finance, April 12, 2013 |
| Cr-K | Emails and Invoices Regarding Formula Boat |
| Cr-L | Royal Finance Invoice Regarding Formula Boat's Storage, August 13, 2014 |
| Cr-M | World Express & Connect's Amended Responses and Objections to Defendants' Request for Admissions, June 15, 2017 |
| Cr-N | Invoice for Porsche and Mercedes from Asia Afla FZE, November 12, 2015 |
| Cr-O | Certification of Alexander Safonov Pages 003-004, April 13, 2016 |
| Cr-P | Invoice from World Express to Marine Transport Logistic, June 26, 2014 |
| Cr-Q | Invoice from World Express to Marine Transport Logistic, February 18, 2014 |
| Cr-R | Subpoena from the Crocus Entities to Copart, Inc. and Attached Affidavit of Janet Wright, February 3, 2017 |

| Cr-S | Calculations of Defendants' Losses Prepared by Pavel Pinchuk |
| Cr-T | Alla Solovyeva's Response to Interrogatory Number 3, December 12, 2014 |
| Cr-U | Marine Transport Logistics's Amended Response to Interrogatories DEF0227-0232, January 23, 2015 |
| Cr-Y | Domain Name Registration for WorldExpress.US, September 21, 2016 |
| Cr-Z | Email from Raya Bakhirev to "Glenda Singleton", November 27, 2009 |
| Cr-AA | Deposition of Raya Bakhirev Pages 65-67, November 7, 2017 |
| Cr-BB | Deposition of Raya Bakhirev Page 65, November 17, 2017 |

## DEPOSITION DESIGNATION

| Ex. | Description of Exhibit |
|---|---|
| D.E. 294 | Deposition Transcript of Vadim Alper, January 31, 2018 |